**Gary J. CHELSON, et al.,
Plaintiffs-Appellants,**

v.

**OREGONIAN PUBLISHING COMPANY, an Oregon corporation, and Patrick L. Marlton, Defendants-Appellees.**

No. 82–3201.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 3, 1983.

Decided Sept. 14, 1983.

As Amended Nov. 16, 1983.

---

Thomas A. Balmer, Rick T. Haselton, Frank Langfitt, Lindsay, Hart, Neil & Weigler, Portland, Or., for plaintiffs-appellants.

Before FERGUSON, BOOCHEVER, and NORRIS, Circuit Judges.

BOOCHEVER, Circuit Judge:

Plaintiffs-appellants sued alleging violations of sections 1 and 2 of the Sherman Act and section 3 of the Clayton Act. The district court granted summary judgment for defendants on the ground that plaintiffs failed to show antitrust injury. We hold that the case presents genuine issues of material fact and reverse.

## I. Background

Chelson and the other appellants are independent newsdealers ("dealers") who distribute the Portland *Oregonian* newspaper published by the appellee Oregonian Publishing Company ("Oregonian"). In late 1979 and early 1980, a number of dealers were approached by Advertising Distributor Services, Inc. ("A.D.S."), a competitor of Oregonian in advertising services. A.D.S. was interested in having the dealers distribute advertising circulars in the Portland market. A.D.S. and the dealers were unable to reach an agreement. A.D.S. eventually abandoned the metropolitan Portland market.

The dealers blame their failure to reach an agreement with A.D.S. on Oregonian, which they claim threatened to terminate any dealers who distributed inserts for A.D.S. They allege that Oregonian and its circulation director violated sections 1 and 2 of the Sherman Act and section 3 of the Clayton Act by selling the *Oregonian* to dealers for resale to readers on the condition that the dealers refrain from dealing with A.D.S. (Numerous other claims have been dismissed from the suit and are not at issue on appeal.) Jurisdiction was based on sections 4 and 16 of the Clayton Act.[1]

Richard H. Williams, George Wagner, Spears, Lubersky, Campbell & Bledsoe, Portland, Or., for defendants-appellees.

---

1. The statutes read in pertinent part:

    Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States....

    15 U.S.C. § 15 (Supp. V 1981).

    Any person ... shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws, ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity ....

    15 U.S.C. § 26 (1976).

The district court granted summary judgment for Oregonian "on the narrow ground that plaintiffs cannot show antitrust injury." Having eliminated all federal causes of action, the court also dismissed a pendent state claim for tortious interference with contractual relations and prospective economic advantage. The dealers seek reversal of both the judgment and dismissal of their pendent claim.

## II. Standard of Review

We conduct *de novo* review of a motion for summary judgment. *State ex rel. Edwards v. Heimann*, 633 F.2d 886, 888 n. 1 (9th Cir.1980). We view the evidence presented in the light most favorable to the dealers to determine if there is a genuine issue of material fact and, if not, whether Oregonian is clearly entitled to prevail as a matter of law. *Id.* at 888.

## III. Antitrust Injury

■ The concept of antitrust injury has been the elusive subject of numerous opinions. Recent Supreme Court cases have directed·courts to examine the context of an antitrust claim in determining whether a plaintiff may recover for alleged injury. In the past, courts have labelled the issue "antitrust standing." The Court now suggests that the term "standing" may be inaccurate because a determination of "antitrust standing" requires inquiry beyond that performed to determine standing in a constitutional sense. "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Associated General Contractors v. California State Council of Carpenters*, —— U.S. ——, —— n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983) (citation omitted).

The doctrine of antitrust injury received careful attention from the Court in *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). In *McCready*, the plaintiff alleged that she was a consumer of psychotherapeutic services and that she had been injured by the defendant group health plan's conspiracy to restrain competition in the psychotherapy market. The health plan allowed reimbursement for the services of psychiatrists, but not those of psychologists. Reviewing the record on a motion to dismiss, the Court held that the plaintiff's allegations brought her within the meaning of section 4 of the Clayton Act as a person injured "by reason of" antitrust violations.

The Court addressed in particular the question whether McCready's injuries were too remote to bring her within the meaning of section 4. It examined the physical and economic nexus between the alleged violation and harm, and the relationship between the alleged injury and "those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy" under section 4. *Id.* 102 S.Ct. at 2547–48. The Court concluded that McCready's alleged injury was "inextricably intertwined" with the injury the alleged conspirators sought to inflict on psychologists and the psychotherapy market. *Id.* at 2551.

In its most recent effort to explain the concept of antitrust injury, the Supreme Court stated that the question whether a plaintiff may recover for alleged injury "requires us to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Associated General Contractors*, —— U.S. at ——, 103 S.Ct. at 907. In that case, plaintiff unions (the "Union") alleged that the defendant multiemployer association coerced some of its members and third parties to enter into business relationships with nonunion firms in violation of the antitrust laws. The Union claimed that this coercion adversely affected the trade of unionized firms and restrained the Union's business activities. The Court held that the Union's allegations of injury resulting from antitrust violations were insufficient as a matter of law, thus the Union was not a person injured within the meaning of section 4 of the Clayton Act. *Id.* at —— ——, 103 S.Ct. at 911–12.

The Court focused on three factors in determining whether sufficient allegations had been made that the Union suffered antitrust injury. First, it noted that the Union was neither a consumer nor a competitor in the market in which trade was restrained, and it was not clear whether the Union's interests would be served by enhanced competition. Second, the Union failed to make specific allegations demonstrating a connection between the alleged antitrust violation and the Union's alleged injury. The Court held that the Union's claim of injury from the alleged unlawful

coercion was therefore speculative. Third, the Court stated that public policy disfavors the potential for duplicative recovery or complex apportionment of damages. That policy weighed against allowing recovery for the indirect injury alleged by the Union.[2]

Disputed issues of fact in this case preclude us from completing the analysis prescribed by the Supreme Court in *McCready* and *Associated General Contractors.* In both *McCready* and *Associated General Contractors,* the Court focused on the relationship between the alleged antitrust violation and the alleged injury. Here, the nature of that relationship depends on facts in dispute, thus those facts are material to the outcome of this case.

The dealers argue that they would have reached an agreement with A.D.S. in late 1979 or early 1980 but for Oregonian's threats to terminate those dealers who contracted with A.D.S. Those threats, they contend, led the dealers to add a "risk premium" to the price they sought from A.D.S. and led to the disruption of the dealers' organization. A.D.S. was then unwilling to meet the unnaturally high price or negotiate with the disrupted organization.[3] Oregonian claims that the dealers and A.D.S. never came close to an agreement because the dealers were asking for too much money and were too disorganized to provide the services A.D.S. required.[4]

The disputed facts are material to the issue of antitrust injury. If in fact the

dealers and A.D.S. would have reached an agreement but for the actions of Oregonian, we would conclude that the dealers have shown antitrust injury within the meaning of section 4 of the Clayton Act. Like McCready, their injury would be "inextricably intertwined" with the alleged injury Oregonian sought to inflict on the advertising distribution market. The dealers would be able to specify the damage to their business caused by Oregonian's actions. That damage would be the loss of business from A.D.S. Unlike the Union's allegations in *Associated General Contractors,* the dealers' claim does not rely on speculation that their business might in some indirect way have been adversely affected by the defendant's conduct. The injury claimed here is distinctly more concrete than that made by the Union, which asserted, at best, a tenuous relationship between the multiemployer's association and some unspecified weakening of Union trade. Although the dealers here are neither consumers nor competitors in the relevant market, it is clear that their interests would directly be served by enhanced competition in the market. If the facts are as the dealers allege, the injury they claim is of the type that sections 1 and 2 of the Sherman Act and section 3 of the Clayton Act were intended to forestall. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 487–88, 97 S.Ct. 690, 696–97, 50 L.Ed.2d 701 (1977). If, however, the publishing company can show that the dealers were too disorganized and were never close to agreeing on price with

**2.** This court recently addressed the concept of antitrust injury in *Ostrofe v. H.S. Crocker Co.,* 670 F.2d 1378 (9th Cir.1982). The court in *Ostrofe* held that a sales manager, forced to resign because he refused to participate in an alleged price-fixing and market allocation scheme between his employer and other manufacturers, had alleged sufficient antitrust injury to bring an action against his employer under section 4 of the Clayton Act. *Id.* at 1379–80. The Supreme Court vacated judgment in the case and remanded in light of its opinion in *Associated General Contractors,* —— U.S. ——, 103 S.Ct. 897, 74 L.Ed.2d 723. *H.S. Crocker Co. v. Ostrofe,* —— U.S. ——, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983). The case will be reconsidered by this court pending further briefing.

**3.** The record contains a number of affidavits in which plaintiffs present evidence in support of these contentions. For example, one dealer testified that the Oregonian's threats caused the dealers to fear that an arrangement by the dealers with A.D.S. would involve "the probable risk of losing the dealership." Thus the dealers "needed to have a high enough financial return in order to balance the risk of losing

[their] dealerships." Another dealer stated that absent the Oregonian's threats, the dealers would have reached an agreement with A.D.S. because there had already been discussion of contract rates, and he believed that "[o]nce the price and organization were established, the other details would fall into place." *See also* Affidavit of G. Garrett (dealers could have put together an organization to deal with A.D.S. and could have reached agreement with A.D.S. in early 1980 but for the Oregonian's acts); Affidavit of D. King (dealers rejected A.D.S. offer in spring 1980 because projected number of inserts decreased, and because Oregonian's acts resulted in dealers' lack of strength and organization).

**4.** The Oregonian relies in particular upon statements made by A.D.S. executives. For example, A.D.S. Vice President Wallstrom testified that the dealers were "a completely disorganized group" with little to offer A.D.S. A.D.S. Chairman Coad agreed, characterizing the dealers as a "very amorphous, disorganized group" whose bids to A.D.S. were high.

A.D.S., regardless of Oregonian's acts, no damages were caused by the alleged antitrust conduct, and the action will fail at trial.

The factual determinations are not for us to make. This case reaches us on appeal from summary judgment. Where material facts are in dispute, a motion for summary judgment is defeated. *Garter-Bare Co. v. Munsingwear, Inc.,* 650 F.2d 975, 979 (9th Cir.1980).

The factual nature of the inquiry was addressed by this court in *Solinger v. A & M Records, Inc.,* 586 F.2d 1304 (9th Cir. 1978), *cert. denied,* 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979). Solinger alleged that the defendant record companies refused to retain a record distribution company Solinger planned to purchase because Solinger directed the distribution company not to comply with a territorial allocation plan established by the defendants. The court stated that section 4 of the Clayton Act requires that a plaintiff "allege nonconclusory facts establishing that there has been injury to the plaintiff's business or property and that the injury ... occurred 'by reason of' the antitrust violation." *Id.* at 1309. The court refused to affirm summary judgment for the defendants because a material factual dispute existed as to whether Solinger was a prospective purchaser of a business, and thereby had suffered injury to business or property. It instructed the district court to determine in fact whether Solinger demonstrated the requisite intention and preparedness to purchase the business allegedly injured. *Id.* at 1309–10. The court emphasized that the issue whether Solinger was a prospective purchaser was "factual in nature", and one

which "seldom presents a situation appropriate for a determination by summary judgment." *Id.* at 1310.

The dealers in this case occupied a position analogous to that of Solinger. They claim that they had the requisite intention and preparedness to expand their advertising distribution services by contracting with A.D.S. That claim requires a factual determination by the trial court before we can determine whether any loss to the dealers' business was caused by the alleged antitrust violation. We therefore remand to the district court for a factual determination whether the dealers would have agreed with A.D.S. on a distribution contract price absent Oregonian's alleged interference, and whether the dealers were sufficiently organized as a group to reach an agreement with A.D.S.[5] If the dealers can show that they suffered antitrust injury, they may proceed to adjudication of their claim.[6]

## IV. Section 3 Clayton Act Violation

■ The publishing company argues that the dealers have no claim under section 3 of the Clayton Act because this case involves the sale of services, not goods. We conclude that the contention is without merit.[7] The agreement between the dealers and Oregonian provides that the dealers purchase the newspapers, which are goods, from Oregonian and resell them to readers.

■ It is well-established that section 3 does not apply to services. *United States v. Jerrold Electronics Corp.,* 187 F.Supp. 545 (E.D.Pa.1960), *aff'd,* 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961); *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1214 (9th Cir.1977). Although this court has noted that "[a]dvertising does not fall within the

---

5. The remand also applies to the district court's holding that the dealers had not shown antitrust injury under section 16 of the Clayton Act. Injunctive relief is characteristically available "even though the plaintiff has not yet suffered actual injury; he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969) (citations omitted).

6. The dealers agree with the district court that adjudication of the injury to competition claim involves the balancing process of a "rule of reason" analysis. We concur. *See A.H. Cox & Co. v. Star Machinery Co.,* 653 F.2d 1302, 1306 (9th Cir.1981). *See also Krehl v. Baskin-Robbins Ice Cream Co.,* 664 F.2d 1348, 1356 (9th Cir.1982).

7. Section 3 of the Clayton Act reads:

> It shall be unlawful for any person engaged in commerce in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States ... or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.

traditional definition of commodities within the purview of section 3," *ALW, Inc. v. United Air Lines, Inc.*, 510 F.2d 52, 57 (9th Cir.1975), we have no difficulty in distinguishing an advertising circular or pamphlet from the general business of advertising. The circular itself is a commodity.

■■■ The publishing company also contends that the statutory language "use or deal in" goods means to lease or sell or to contract to lease or sell and does not include mere distribution. We cannot agree. In statutory construction, absent a clear legislative intent to the contrary, the statutory language itself is controlling. *Bread Political Action Committee v. FEC*, 455 U.S. 577, 580, 102 S.Ct. 1235, 1237, 71 L.Ed.2d 432 (1982). We find the language of section 3 unambiguous. Its prohibition against requiring a purchaser not to deal in the commodity of a competitor is not restricted to a situation where the purchaser resells the commodity. Had Congress wished to restrict the application of section 3 to goods that are resold, it would have repeated the language "to lease or make a sale." Instead, it chose the broader language "use or deal in." Here the distributors allege that they were prohibited from dealing in the advertising materials of a competitor of the *Oregonian*. The distributors, therefore, may assert their exclusive dealing claim under both Sherman Act § 1 and Clayton Act § 3.

Summary judgment for defendants is REVERSED and REMANDED. The dismissal of the pendent state claim is REVERSED pending determination of the factual issues on remand of the federal claims.

NORRIS, Circuit Judge, dissenting:

I would affirm summary judgment for the defendants on the narrow ground that plaintiffs have failed to adduce sufficient evidence of antitrust injury to raise a triable issue of fact. I cannot put it better than the district judge:

Defendants have produced overwhelming evidence about the failure of plaintiffs to come to terms with A.D.S. Coad, of A.D.S., noted that during the crucial time period for negotiation with the distributors, defendant Publishing Co. actually helped A.D.S. distribute Levitz preprints when Community Publications abandoned the A.D.S. program. Thereafter, A.D.S. distributed through its publication *Happenings*. That program ultimately fell through. A.D.S. also tried to use the *Hollywood News* carriers. Despite A.D.S.'s attempts to establish itself in the Portland market, it was unable to do so on a competitive basis. The major obstacle in negotiations with plaintiff distributors was the unrealistic prices proposed by plaintiffs. In short, A.D.S. and plaintiffs were never close to negotiating a contract or agreement for distribution....

Plaintiffs argue that their prices were unrealistically high because of the anticompetitive activity of defendant Publishing Co. However, they have not produced any evidence to substantiate this claim. At best, the assertion is indirectly supported by plaintiffs' speculation that their prices might have been lower had they not been concerned about their contracts with the Publishing Co. This speculation does not sufficiently rebut defendants' evidence on this point. The fact remains that plaintiffs and A.D.S. never came close to agreeing on terms for distribution. The depositions of A.D.S. employees Coad and Wallstrom underscore the failure of the distributors to effectively present a viable competitive program for A.D.S.

I therefore respectfully dissent.