**Charles E. HAFF, Plaintiff,**

v.

**JEWELMONT CORPORATION and Mervyns, Inc., Defendants.**

**No. C–83–3104–MHP.**

United States District Court, N.D. California.

Oct. 5, 1984.

Christopher R. Lucas, Law Offices of Edward A. Weiss, Walnut Creek, Cal., for plaintiff.

Stephen C. Tausz, Keith R. Weed, Bronson, Bronson & McKinnon, San Francisco, Cal., for Mervyn's, Inc.

Ralph C. Alldredge, San Francisco, Cal., Thomas Darling, Dylan J. McFarland,

Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., for Jewelmont Corp.

## OPINION

PATEL, District Judge.

This matter is before the court on a motion to dismiss. The issue addressed by the motion is whether plaintiff has standing to sue for alleged violations of § 2(c) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(c) (1970), the so-called "brokerage" provision of the Robinson-Patman Act.

### I. FACTS

Plaintiff, Charles E. Haff ("Haff"), is engaged in the business of selling jewelry from wholesale manufacturers to retailers on a commission basis. Prior to August 1, 1981 Haff was employed by defendant Jewelmont Corporation ("Jewelmont") as a manufacturer's representative, at a 12% commission rate, to sell Jewelmont's Golden Mist line of jewelry. Haff was given an exclusive territory to sell the Golden Mist line to department stores and retail chain jewelry stores in the western United States. As Jewelmont's manufacturer's representative, Haff developed an account with defendant Mervyn's, Inc. ("Mervyn's"), a large California-based chain department store. Haff earns substantial commissions from Jewelmont's sales to Mervyn's prior to August 1, 1981.

On August 1, 1981, Jewelmont converted the Mervyn's account into a "house account." Under this arrangement, Jewelmont sold directly to Mervyn's, with no commissions payable to Haff. This action breached an alleged oral agreement between Haff and Jewelmont that Jewelmont would not convert any accounts developed by Haff into house accounts. Mervyn's was granted an 18% discount on these direct sales, or 6% more than Haff had been receiving in commissions prior to August 1, 1981. This 18% discount was not made available to other Jewelmont buyers.

Count I of the complaint alleges violations of § 2(c) of the Clayton Act, as amended by the Robinson-Patman Act, 15

U.S.C. § 13(c) (1970), in that the discount to Mervyn's was "in lieu of" brokerage previously paid to Haff. Counts II through V are pendent state claims for conspiracy, intentional interference with business advantage, fraudulent misrepresentation, and negligent misrepresentation.

Jewelmont and Mervyn's have both moved to dismiss the antitrust claim on the ground that Haff does not allege the requisite competitive injury to confer standing under the antitrust laws.[1] In addition, Jewelmont argues that even if Haff does have standing, a manufacturer's conversion from the use of a broker to a direct selling arrangement, at a discount reflecting the elimination of commissions, does not without more constitute a violation of § 2(c).

Because the court concludes plaintiff lacks antitrust standing, the merits of this § 2(c) argument are not reached except to the extent necessary to resolve the standing issue.

## II. DISCUSSION

### A. *The Legislative Intent Behind § 2(c)*

Haff claims that the defendants' actions violated the "brokerage" provision of the Robinson-Patman Act, § 2(c) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(c) (1970). Section 2(c) provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

■ The legislative history of § 2(c) establishes that the section was primarily designed to prohibit "dummy brokerage" arrangements by which large, institutional buyers would exercise their leverage to demand discounts under the guise of "brokerage." *See* H.R.Rep. No. 2287, 74th Cong., 2d Sess. 15 (1936). As the Supreme Court noted in its most comprehensive analysis of § 2(c):

The Robinson-Patman Act was enacted in 1936 to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power. A lengthy investigation revealed that large chain buyers were obtaining competitive advantages in several ways other than direct price concessions and were thus avoiding the impact of the Clayton Act. One of the favorite means of obtaining an indirect price concession was by setting up "dummy" brokers who are employed by the buyer and who, in many cases, rendered no services. The large buyers demanded that the seller pay "brokerage" to these fictitious brokers who then turned it over to their employer. This practice was one of the chief targets of § 2(c) of the Act.

. . . :

Congress enacted the Robinson-Patman Act to prevent sellers and sellers' brokers from yielding to the economic pressures of a large buying organization by granting unfair preferences in connection with the sale of goods.

*FTC v. Henry Broch & Co.*, 363 U.S. 166, 168–69, 174, 80 S.Ct. 1158, 1160, 4 L.Ed.2d 1124 (1960). By outlawing such indirect price concessions, Congress hoped "to force price discriminations [achieved by manipulation of brokerage fees and discounts] out into the open where they would be subject

---

[1.] Both Jewelmont and Mervyn's also urge dismissal of the pendent state claims, since dismissal of the antitrust claim would leave this court without federal question jurisdiction. Because this court's jurisdiction obviously depends upon resolution of the antitrust standing issue, today's holding, that Haff lacks standing to sue under the antitrust laws, mandates dismissal of the entire complaint. The court does not thereby express any opinion as to the state causes of action.

to the scrutiny of those interested, particularly competing buyers." *Biddle Purchasing Co. v. FTC,* 96 F.2d 687, 692 (2d Cir. 1938); *see also Allen Pen Co. v. Springfield Photo Mount Co.,* 653 F.2d 17, 25 (1st Cir.1981).

### B. *Antitrust Standing, Antitrust Injury, and § 4 of the Clayton Act*

Sec. 2(c) of the Clayton Act is the *substantive* provision which plaintiff claims establishes his entitlement to relief for an abuse of the brokerage function. Plaintiff confuses this section, which defines the anticompetitive conduct, with the procedural or remedial requirements of § 4 of the Clayton Act, 15 U.S.C. § 15 which gives the right to sue to a person injured "by reason of" an antitrust violation. *Cf. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 486, 97 S.Ct. 690, 696, 50 L.Ed.2d 701 (1977) ("Intermeshing a statutory prohibition against acts that have a potential to cause certain harms with a damage action intended to remedy those harms is not without difficulty.") Whether a party's interests are protected by the antitrust laws is analytically distinct from whether that party has standing to sue under the antitrust laws. As one antitrust scholar has remarked, "[E]ven where there is a violation and an injury to competition, the plaintiff may still not be the 'right' person to complain of these acts." E. Kintner & J. Bauer, *Federal Antitrust Law,* Vol. III § 30.11, at 663 (1983).

■ Whether one has standing to sue under the antitrust laws is determined by reference to § 4. This inquiry is not conducted solely in the vacuum of § 4. As the Supreme Court has pointed out in its recent efforts to lay down some specific guidelines for determining antitrust standing, "the question requires us to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants and the relationship between them." *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983).

*See also Blue Shield of Virginia v. McCready,* 457 U.S. 465, 482, 102 S.Ct. 2540, 2550, 73 L.Ed.2d 149 (1982) ("the injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation") (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. at 489, 97 S.Ct. at 697). Nevertheless, the inquiry begins with § 4, a provision wholly overlooked by plaintiffs.

The class of persons who may maintain a private action for treble damages under the antitrust laws is broadly defined in § 4 of the Clayton Act, 15 U.S.C. § 15:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

■ On its face, § 4 seems broad enough "to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation." *Associated General,* 459 U.S. at 529, 103 S.Ct. at 904. However, for a variety of reasons not the least of which is the fear that the lure of treble damages and attorney's fees would inundate the courts with spurious antitrust claims, the judiciary has consistently limited the scope of recovery under § 4. *Id.* at 912 (citing *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 745, 97 S.Ct. 2061, 2074, 52 L.Ed.2d 707 (1977)). *See also Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292, 1295 (2d Cir.1971). It is by now well-established that the "by reason of" language of § 4 imposes a standing requirement on private antitrust plaintiffs which requires proof of legal causation, similar to the concept of proximate cause in the law of torts, as a predicate to recovery.[2] Berger &

---

**2.** There has been a tremendous amount of confusion among courts and commentators as to the difference, if any, between the terms "antitrust standing" and "antitrust injury." *See, e.g.,*

*Ostrofe v. H.S. Crocker Co., Inc.,* ("*Ostrofe I*"), 670 F.2d 1378, 1386 & n. 23 (9th Cir.1982) (noting that the distinction between antitrust stand-

Bernstein, *An Analytical Framework for Antitrust Standing*, 86 Yale L.J. 809, 810–11 (1977); *see also Associated General*, 103 S.Ct. at 906–08. As the Supreme Court recently noted:

> An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but "despite the broad wording of § 4 there is. a point beyond which the wrongdoer should not be held liable." [Citation omitted]. It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property.

*McCready*, 457 U.S. at 476–77, 102 S.Ct. at 2547.

C. *The Evolution of Antitrust Standing*

Although there has been substantial agreement that § 4 imposes a standing requirement on private antitrust plaintiffs, the lower courts have not agreed as to the precise contours of antitrust standing analysis. Absent guidance from the Supreme Court, which has been provided only very recently, the lower courts have developed several different tests for determining antitrust standing. The Ninth Circuit, for example, has for many years applied the so-called "target area" test, under which the plaintiff "must show that he is within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry." *Conference of Studio Unions v. Loew's, Inc.*, 193 F.2d 51, 54–55 (9th Cir.1951), *cert. denied*, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952); *accord, Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 546–47 (5th Cir.1980); *Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1, 17–18 (1st Cir.1979); *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d at 1295. This approach focuses on both the directness of the plaintiff's injury and the intention of the antitrust violator to injure the plaintiff: "[T]he rule is that one who is

---

ing and antitrust injury is "unclear"), *vacated and remanded*, 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983) (remanding for reconsideration in light of *Associated General* ), 740 F.2d 739 (9th Cir.1984) ("*Ostrofe II*") (on remand). Many courts, including the Ninth Circuit, have regarded the two as opposite sides of the same coin, and have merged standing analysis with antitrust injury analysis. *See, e.g., Lupia v. Stella D'Oro Biscuit Co., Inc.*, 586 F.2d 1163, 1167–69 (7th Cir.), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979); *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495, 499–500 (9th Cir.1977); *GAF Corp. v. Circle Floor Co.*, 463 F.2d 752 (2d Cir.1972), *cert. denied*, 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973); *but see* Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term —1977*, 77 Colum.L.Rev. 979, 996–97 (1977) (arguing that antitrust injury and antitrust standing are "related, but, nonetheless, disparate doctrines"). The Supreme Court, in *Associated General*, has recently noted that "the focus of the doctrine of 'antitrust standing' is somewhat different from that of standing as a constitutional doctrine," since "[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." 103 S.Ct. at 907 n. 31.

The indiscriminate merging of the two doctrines may sometimes generate analytical confusion; however, the distinction seldom, if ever, makes a practical difference. The primary difference between "antitrust standing" and "antitrust injury" is the point in the proceedings where the plaintiff's right to recover under the antitrust laws is challenged. To say that a plaintiff lacks "standing" is to say that there is no set of facts which could be adduced at trial to show the requisite competitive injury; this decision can be made on a motion to dismiss. To say that a plaintiff has not proved "antitrust injury," on the other hand, is to say that plaintiff has not satisfied the burden of showing that he or she has been injured "by reason of" the antitrust laws. In most cases, this decision cannot be made until after trial. Hence one may have "standing" sufficient to survive a motion to dismiss, yet be unable to prove "antitrust injury" at trial. This may be why the Supreme Court spoke of "antitrust injury" in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), a case which went to trial, while it spoke of "antitrust standing" in *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 477, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (1982), a case decided on the basis of a motion to dismiss. There is no indication in *Associated General*, that the Court regards the difference between the two concepts as having any practical significance, and therefore this court refers to "antitrust standing" in this case in its present posture. As discussed above, *McCready* and *Associated General* make it clear that antitrust injury must be looked at in order to evaluate antitrust standing.

only *incidentally* injured by a violation of the antitrust laws—the bystander who was hit but not aimed at—cannot recover against the violator." *Karseal Corp. v. Richfield Oil Corp.*, 221 F.2d 358, 363 (9th Cir.1955).

Both parties to the instant case implicitly assumed in their briefs that the "target area" approach to standing is still the test to be applied by courts in the Ninth Circuit. As discussed *infra*, however, the Supreme Court's recent decisions in *Associated General*, 103 S.Ct. at 907–08 n. 31 and *McCready*, 457 U.S. at 476–79 n. 12, 13, 14 and 15, 102 S.Ct. at 2547–48 n. 12, 13, 14 and 15, demonstrate that there is little vitality left to the "target area" approach to antitrust standing. The lesson of these most recent cases is that formalistic tests are disfavored and the totality of the circumstances must be considered in light of the principles in these cases. Even this Circuit now disagrees as to its commitment to the "target area" test. *Compare Parks v. Watson*, 716 F.2d 646, 658 (9th Cir.1983) ("We have used the 'target area' approach....") with *Ostrofe v. H.S. Crocker Co., Inc.*, ("*Ostrofe I*"), 670 F.2d 1378, 1382–83, n. 7 (9th Cir.1982), vacated and remanded, 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983) (remanding for reconsideration in light of *Associated General*), *Ostrofe v. H.S. Crocker Co., Inc.*, ("*Ostrofe II*"), 740 F.2d 739 (9th Cir.1984) (on remand).[3]

Other circuits have focused exclusively on the directness of the injury, *see, e.g., Reibert v. Atlantic Richfield Co.*, 471 F.2d 727, 731 (10th Cir.1973), while still others have looked to see whether the injury is "arguably within the zone of interests protected by the antitrust laws." *Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142, 1151–52 (6th Cir.1975). More recently, the Third Circuit adopted a "balance of factors" test which combines the direct injury test with a policy analysis. *Bravman v. Bassett Furniture Industries, Inc.*, 552 F.2d 90, 99–100 (3d Cir.1977).

Only recently has the Supreme Court attempted to provide some guidance to the lower courts as to the factors to be examined in determining whether a given plaintiff's injury is sufficiently related to an antitrust violation to confer a private cause of action under the antitrust laws. Beginning with *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), which clearly imposed a competitive injury requirement on all private antitrust suits, and continuing with *McCready*, 457 U.S. at 465, 102 S.Ct. at 2540 (1982) and *Associated General*, 459 U.S. 519, 103 S.Ct. at 897 (1983), the Supreme Court has refined the various tests employed by the lower courts and adopted a unitary, more flexible approach to antitrust standing.

*Brunswick* involved a claim by certain operators of bowling alleys that Brunswick

---

**3.** Despite the clear disfavor shown by the Supreme Court for these formalistic tests and the adoption of a multifactor test, despite the application of such a test just eight days earlier in *Chelson v. Oregonian Publishing Co.*, 715 F.2d 1368 (9th Cir.1983) and despite its acceptance by the Circuit once again in *Solinger v. A. & M. Records, Inc.*, 718 F.2d 298 (9th Cir.1983), another panel of this Circuit proceeded to use the "target area" test saying that:

> If no clear answer emerges [from this analysis] we must determine standing by balancing competing policy interests, principally those of effective enforcement of the antitrust laws on the one hand and avoiding vexatious litigation and excessive liability on the other. *Parks v. Watson*, 716 F.2d 646, 659 (9th Cir. 1983) citing *Ostrofe I* and *Associated General*.

Now apparently in *Ostrofe II* some form of the *Associated General* analysis has been adopted. *Ostrofe II* placed particular emphasis

on *McCready*, 457 U.S. 465, 102 S.Ct. at 2540. Curiously, under the "target area" approach it is difficult to see how plaintiff McCready could have survived a standing challenge. She was not a direct target; the targets were the psychologists. Unless the "target area" was defined without perimeters, *McCready* would find herself out of court in "target area" jurisdictions.

In any event, it makes no difference to the outcome of this case whether we employ the "target area" approach or the multifactor approach of *Associated General*, since even under the "target area" test it is clear that Haff, being a competitor of neither Jewelmont nor Mervyn's, is not within "that area of the economy which is endangered by a breakdown of competitive conditions." *Conference of Studio Unions v. Loew's, Inc.*, 193 F.2d at 54–55. Moreover, though Haff has certainly been "hit," there is no allegation that he has been "aimed at." *See Karseal Corp. v. Richfield Oil Corp.*, 221 F.2d at 363–64.

Corp.'s acquisition of competing bowling centers violated § 7 of the Clayton Act, since "because of its size, [Brunswick] had the capacity to lessen competition in the markets it had entered by driving smaller competitors out of business." 429 U.S. at 481, 97 S.Ct. at 693. Plaintiffs alleged lost profits on the theory that if Brunswick had not merged with the local bowling centers, these centers would have gone out of business and plaintiffs' profits would therefore have been greater. *Id.*

In holding that § 4 did not allow private damage suits for such injury, the Court clearly related recovery under § 4 to proof of competitive injury:

> [W]hile respondents' loss occurred "by reason of" the unlawful acquisitions, it did not occur "by reason of" that which made the acquisitions unlawful.... [F]or plaintiffs to recover treble damages [under § 4] on account of § 7 violations, they must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the *anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.*

429 U.S. at 488–89, 97 S.Ct. at 697 (emphasis added). The Court pointed out that plaintiffs' injury—the loss of income which would have accrued had the acquired centers gone bankrupt—was completely unrelated to the potential anti-competitive effects which made the merger unlawful under § 7:

> Respondents would have suffered the identical "loss"—but no compensable injury—had the acquired centers instead obtained refinancing or been purchased by "shallow pocket" parents ... Conversely, had petitioner acquired thriving centers—acquisitions at least as violative of § 7 as the instant acquisitions—re-

spondents would not have lost any income that they otherwise would have received.

429 U.S. at 487 & n. 12, 97 S.Ct. at 697 & n. 12. Since the alleged injury was not of "the type that the statute was intended to forestall," 429 U.S. at 487–88, 97 S.Ct. at 696–97 (quoting *Wyandotte Co. v. United States*, 389 U.S. 191, 202, 88 S.Ct. 379, 386, 19 L.Ed.2d 407 (1967)), recovery under § 4 was unauthorized.

The Court expanded on this theme in *McCready*, 457 U.S. 465, 102 S.Ct. at 2540, and in so doing took an important step in clarifying antitrust standing analysis. *McCready* involved a claim by a group health plan subscriber that she had been injured by a conspiracy between Blue Shield and an organization of Virginia psychiatrists to restrain competition in the psychotherapy market. The health plan allowed reimbursement for services performed by psychiatrists, but denied reimbursement for comparable work performed by psychologists unless such claims were billed to a physician. Plaintiff was thus faced with a "Hobson's choice" in that she was compelled to choose between visiting a psychologist and forfeiting reimbursement under the plan, or receiving reimbursement by foregoing treatment by the practitioner of her choice. 457 U.S. at 483, 102 S.Ct. at 483.

The Court, examining the record on a motion to dismiss, held that the plaintiff had standing to sue under § 4 for the alleged violation. In evaluating whether the alleged injury was "too remote" to confer standing, quoting *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728 n. 7, 97 S.Ct. 2061, 2065 n. 7, 52 L.Ed.2d 707 (1977), the Court looked at two factors: "(1) the physical and economic nexus between the alleged violation and the harm to the plaintiff; and (2), the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendants' conduct unlawful ...." *McCready*, 457 U.S. at 477–78, 102 S.Ct. at 2547–48.[4]

---

**4.** The Court specifically refused to consider the propriety of any of the various tests employed by the lower courts to determine antitrust stand-

ing: "We have no occasion here to evaluate the relative utility of any of these possibly conflict-

With regard to the first factor, the Court found that plaintiff's alleged injury was an integral aspect of the conspiracy, since the denial of reimbursement to consumers was the "very means by which it is alleged that Blue Shield sought to achieve its illegal ends." 457 U.S. at 479, 102 S.Ct. at 2548. The Court rejected defendants' argument that only participants in the group health care market—in other words, competitors of the defendants—had standing to sue.

With regard to the second factor, the Court concluded that McCready's alleged injury was "inextricably intertwined" with the injury the alleged conspirators sought to inflict on psychologists and the psychotherapy market. Quoting from *Brunswick*, the Court found that McCready's alleged injury fell squarely within the area of congressional concern in passing § 1 of the Sherman Act, and therefore "flow[ed] from that which [made] defendants' acts unlawful." 457 U.S. at 484, 102 S.Ct. at 2551 quoting *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697.

The Court's most recent explication of antitrust standing principles is found in *Associated General*. *Associated General* does not represent a departure from *McCready*. It merely amplifies upon the considerations spelled out in *McCready* and gives further direction to the lower courts. Once again the Supreme Court discouraged the use of a formalistic test and emphasized the need for a case-by-case analysis. The court denied standing to plaintiff unions (the "Union") which alleged that an employer's association had coerced certain third parties to enter into business relations with nonunion firms, in violation of § 1 of the Sherman Act. The Union alleged that this coercion adversely affected the trade of certain unionized firms, and

thus restrained the Union's business activities.

In discussing § 4 of the Clayton Act, the Court stated that the issue of whether a private antitrust plaintiff may recover treble damages under § 4 "requires us to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." 103 S.Ct. at 907. Observing that the various tests employed by the lower courts for determining standing "may lead to contradictory and inconsistent results," *id.* at 907–08 n. 33, the Court substituted a flexible, multifactor analysis in an attempt to bring some coherence to the complicated area of antitrust standing.

The Court discussed three factors to be used in exploring the relationship between the plaintiff's harm and the defendants' alleged wrongdoing. First, it must be determined whether the alleged injury "was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws." *Id.* at 909, *citing McCready*, 102 S.Ct. at 2550, and *Brunswick*, 429 U.S. at 488–89, 97 S.Ct. at 697. In applying this factor to the case at hand, the Court noted that the antitrust laws were enacted for the protection of competition, and, in contrast to the health plan subscriber in *McCready*, "the Union was neither a consumer nor a competitor in the market in which trade was restrained ... Moreover, it has not even alleged any marketwide restraint of trade." 103 S.Ct. at 909 & n. 40. The Court further distinguished *McCready* on the ground that the Union's alleged injury was not "inextricably intertwined" with the competitive restraint giving rise to the antitrust violation, since "[i]t [was] not clear whether the Union's interests would be served or disserved by enhanced competition in the market." *Id.*[5]

---

ing approaches toward the problem of remote antitrust injury." 457 U.S. at 476 n. 12, 102 S.Ct. at 2547 n. 12. As discussed infra, however, the Court in *Associated General* resolved the "conflicting approaches" of the circuits by adopting its own unitary, multifactor analysis.

**5.** The Ninth Circuit, in the recent case of *Chelson v. Oregonian Publishing Co.*, 715 F.2d at 1371, suggested in dicta that whether an antitrust plaintiff's interests "would be served or

disserved by enhanced competition in the market" is a factor to be examined in each case under the analysis set forth in *Associated General*. *Chelson* involved an antitrust action brought by certain news dealers who alleged that defendant newspaper publisher had violated the Sherman Act by selling newspapers to dealers on the condition that they refuse to deal with the publisher's competitor. Although the Ninth Circuit remanded for determination of further facts, and hence did not directly decide

A second factor to be examined in each case is the "directness or indirectness of the asserted injury." *Id.* at 910. In contrast to the consumer's injury in *McCready*, which was a direct result of the alleged conspiracy between Blue Shield and the psychiatric organization, the Union's alleged injuries "were only an indirect result of whatever harm may have been suffered by 'certain' contractors and subcontractors." *Id.* Moreover, because of the absence of specific allegations in the complaint demonstrating the causal connection between the Union's injuries and the alleged group boycott, the Court found that the Union's damages claim was "highly speculative." *Id.* at 911.

A final, somewhat related factor is whether the damages sought would create "the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *Id.* at 912, citing *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 737–38, 97 S.Ct. 2061, 2070, 52 L.Ed.2d 707 (1977). The Court found that the Union's complaint, if allowed to stand, would burden the district court with the task "of identifying damages and apportioning them among directly victimized contractors and subcon-

tractors and indirectly affected employees and union entities." 103 S.Ct. at 912. The difficulty of such apportionment created a risk of duplicative recovery, which is contrary to public policy. *Id.* at 911–12.

### D. *The Application of Current Antitrust Standing Analysis to the Facts of the Present Case*

■ When the facts of the present case are examined in light of the principles developed in *Brunswick, McCready* and *Associated General*, there can be no doubt that the complaint must be dismissed for failure to state a claim upon which relief may be granted. Although Haff's injury is certainly a direct consequence of defendants' alleged anti-competitive conduct, thus satisfying one of the criteria set forth in *Associated General* and earlier antitrust standing cases,[6] the nature of Haff's injury is completely independent of any antitrust violation. Hence his injury is not of the type Congress sought to prevent in allowing private actions under the antitrust laws. Moreover, because Haff's alleged damages overlap whatever damages might be claimed by injured competitors of Mervyn's, there is a risk of duplicative recovery which counsels against allowing this action to proceed.

the issue, some of the court's language could be construed to mean that a private antitrust plaintiff who is neither a consumer nor a competitor in·the relevant market would have standing under *Associated General* provided his or her interests "would be served by enhanced competition in that market." *Id.*

This court does not attach much significance to ·this language. Many individuals benefit from increased competition in a given market, but this has never been enough to confer standing. Neither *Associated General* nor *Chelson* stands for a rule that any person, no matter how tangentially he or she might benefit from increased competition in a given market, has standing to complain of an antitrust violation. Rather, if any rule emerges from *Associated General*, it is that only consumers or competitors in a relevant market who are injured "by reason of" an antitrust violation have standing to sue under § 4.

Actually this language appears to come from *Associated General*'s analysis of the plaintiff un-

ion which, it noted, was neither a competitor nor a consumer. The Court noted in passing that it was not clear how the interest of the union would be served by increased competition. This made it all the more clear that the union's injury, if any, was not the result of any anti-competitive conduct contemplated by the antitrust laws, but rather was the result of its labor interest protected by the labor laws.

6. In discussing the factors to be examined in determining whether a given plaintiff has standing to sue under § 4, the Court in *Associated General* did not attempt to rank these factors in terms of their relative importance. However, this court is of the opinion that the directness of a plaintiff's injury is a far less salient variable than the relationship between the injury and the antitrust violation. Not only is this suggested by the manner in which these factors were discussed in *Associated General*, but it is also suggested by the Court's reasoning in *Brunswick* and *McCready*.

### 1. *The Nature of Haff's Alleged Injury*

Haff claims that he has lost substantial commissions as a result of Jewelmont's conversion of the Mervyn's account into a "house account." The complaint alleges that not only did this action breach an oral agreement between Haff and Jewelmont, but the subsequent 18% discount to Mervyn's is said to violate § 2(c) since it constitutes a discount "in lieu of" brokerage previously paid to Haff.

The fact of the matter, however, is that Haff's injury—lost commissions—has nothing whatsoever to do with the alleged antitrust violation, and hence is not "of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws." *Associated General*, 103 S.Ct. at 909, citing *McCready*, 457 U.S. at 483, 102 S.Ct. at 2550, and *Brunswick*, 429 U.S. at 488–89, 97 S.Ct. at 697. To illustrate this point, the injury to Haff would have been precisely the same if Jewelmont had converted *all* of its accounts to "in-house" accounts and had not granted preferential treatment to Mervyn's. Haff would still have lost his commissions, but there would have been no violation of § 2(c). *See FTC v. Henry Broch & Co.*, 363 U.S. 166, 176, 80 S.Ct. 1158, 1164, 4 L.Ed.2d 1124 (1960) (stating in dicta that a price reduction based upon savings in brokerage expenses does not violate § 2(c) if given to all customers). To further illustrate the independence of Haff's injury and the injury to competition which is the gravamen of § 2(c) violation (or of *any* antitrust violation, for that matter), if Jewelmont had *not* converted the Mervyn's account but had instead paid Mervyn's a disguised rebate, Haff would not have been injured at all, yet there would still be a violation of § 2(c). This analysis is precisely the same as in *Brunswick*, where the Court noted that plaintiffs' alleged injury—the loss of profits which would have been earned had the acquired bowling centers gone bankrupt—was completely unrelated to the potential anticompetitive effects which made the "deep-pocket" merger unlawful under § 7 of the Clayton Act. This is reinforced by the reasoning in *Lupia v. Stella D'Oro Biscuit Co., Inc.*, 586 F.2d 1163, 1169 (7th Cir.), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979), where the Seventh Circuit held that an exclusive distributor did not have standing to sue regarding a 5% discount paid directly to favored buyers and charged back to the distributor, since "[t]he defendant's anticompetitive action, the 5 percent rebate to chain stores, would have been equally anticompetitive if plaintiff had not been required to absorb it."

Haff, like the Union in *Associated General* "was neither a consumer nor a competitor in the market in which trade was restrained." *Associated General*, 103 S.Ct. at 909. Haff has not alleged, nor could he allege, that he is a participant in either the seller's (Jewelmont) or the buyer's (Mervyn's) market. Moreover, Haff "has not even alleged any marketwide restraint of trade." *Id.* at 909 n. 40.[7] For this reason alone, Haff must be denied standing to sue for the alleged antitrust violation. Though he may have been injured "by reason of" defendants' actions, he was not injured "by reason of" that which made defendants' actions unlawful.

---

7. Like the Union's in *Associated General*, it is also unclear whether Haff's interests would be served or disserved by increased competition in either the seller's (Jewelmont) or the buyer's (Mervyn's) market. If, for example, Jewelmont were the sole seller of jewelry, it could presumably charge a higher price for its products reflecting its monopoly power. Whether this would benefit Haff, as manufacturer's representative earning a 12% commission on all sales, would clearly depend upon the elasticity of demand for jewelry in the applicable price range. If a 10% price increase generated a decrease in jewelry sales of more than 10%, Jewelmont's total revenues, and hence Haff's commissions, would decline. Conversely, if the same 10% price increase caused *less* than a 10% decline in volume, Haff's commissions would increase. A similar result would obtain were Mervyn's the sole buyer of jewelry, and it attempted to exercise its monopsony power to lower the market price of jewelry. Unlike the health plan subscriber in *McCready*, 457 U.S. at 484, 102 S.Ct. at 2551, Haff's alleged injury is not "inextricably intertwined" with the competitive restraint giving rise to the § 2(c) violation, since the extent to which Haff would benefit or suffer from increased competition is unclear.

*See Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697.

### 2. *Risk of Duplicative Recovery*

A second reason why Haff must be denied standing in this case is because an award of damages to Haff would implicate the important public · policy concern of avoiding the risk of duplicative recoveries. *Associated General,* 103 S.Ct. at 912; *see also Illinois Brick Co. v. Illinois,* 431 U.S. 720, 737, 97 S.Ct. 2061, 2070, 52 L.Ed.2d 707 (1977); *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). This is due to the fact that any recovery by Haff would significantly, if not completely, duplicate actual damages claimed in future actions by direct competitors of Mervyn's under § 2(a) of the Robinson-Patman Act,[8] since Haff's lost commissions (12%) constitute a substantial portion of the price determination (18%) allegedly allowed to Mervyn's. Were we to allow Haff to maintain this action, Jewelmont would be exposed to the "risk of multiple liability" from future § 2(a) lawsuits. *Illinois Brick,* 431 U.S. at 737 n. 18, 97 S.Ct. at 2070 n. 18.

### E. *Prior § 2(c) Standing Cases*

Today's holding, that Haff lacks standing to sue under the antitrust laws for the alleged violation of § 2(c), is consistent with every single case which has previously addressed this issue. *See, Larry R. George Sales Co. v. Cool Attic Corp.,* 587 F.2d 266, 270–72 (5th Cir.1979); *J.F. Reed Co., Inc., et al. v. K-Mart Corp.,* 1982–1 Trade Cases ¶¶ 64,499–500 (E.D.Mich.1981); *Green Bay Packaging, Inc. v. Hoganson & Associates, Inc.,* 362 F.Supp. 78, 82 (N.D. Ill.1973); *Robinson v. Stanley Home Products, Inc.,* 178 F.Supp. 230 (D.Mass.1959), *aff'd,* 272 F.2d 601, 603–04 (1st Cir.1959). These cases all stand for the proposition

that an eliminated middleman has not suffered the requisite competitive injury to maintain a private action for treble damages under § 4 for an alleged violation of § 2(c) of the Robinson-Patman Act.

*Robinson v. Stanley Home Products, Inc.,* is squarely on point. Plaintiff was a manufacturer's representative with an exclusive territory in the New England area to sell defendant's products. After the representative had secured two orders from a large buyer, the seller terminated him and dealt directly with the buyer. As in the present case, the plaintiff alleged that the price paid by the buyer for the direct sales was discriminatory. The district court held that plaintiff had failed to state a claim under § 2(c): "The reduction or elimination of a commission or brokerage fee payable by the seller to its own agent to enable the seller to sell at a lower price is not forbidden by [§ 2(c)]." 178 F.Supp. at 232. The court went on to note that even if defendants' conduct did constitute a violation of § 2(c), plaintiff nonetheless could not recover under § 4. The court's reasoning is persuasive:

> [T]he only specific injury [plaintiff] sets forth is that he has not been paid commissions due to him ... Failure to pay these commissions would have no conceivable connection with any subsequent violation of the antitrust laws ....
>
> Only one who has been directly injured by a violation of the antitrust laws is entitled to recover damages under § 15. Persons whose only loss is from the interruption or diminution of a profitable relationship with a party directly affected by the violation have been held to have been injured only remotely and indirectly. [Citations and footnote omitted].
>
> It is difficult to see how in this case the claimed injury could be considered

---

**8.** Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a) (1970), provides, in pertinent part:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved

in such discrimination are in commerce ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them ....

the direct result of the alleged violation. Assuming that Plura sold cups to Stanley at a lower price than it charged competitors of Stanley, this price differential was not the cause of plaintiff's loss of his commission ... If under his agreement with Plura plaintiff was entitled to the exclusive right to sell to Stanley or was entitled to commissions on all sales to Stanley even though he played no part in them, then his injury was caused by Plura's breach of contract, or possibly by wrongful interference by Stanley with his contractual relationship with Plura. The lower price allowed to Stanley by Plura may have been a source of injury to some competitor of Stanley. It did not cause plaintiff's injury. The fact that elimination of plaintiff's commission may have been economically a condition precedent to the granting of a lower price by Plura does not make the failure to pay that commission a result of the lower price.

*Id.* at 233.

The First Circuit affirmed, agreeing that the granting of a price reduction following a seller's conversion to a direct selling arrangement does not, without more, constitute a violation of § 2(c). 272 F.2d at 603–04. *Robinson* was cited with approval by the Supreme Court in *FTC v. Henry Broch & Co., Inc.*, 363 U.S. at 176 n. 18, 80 S.Ct. at 1164 n. 18 (1960).

Similarly, in *Larry R. George Sales Co. v. Cool Attic Corp.*, plaintiff, a manufacturer's representative for a producer of attic fans, alleged that defendant had violated § 2(c) by paying a commission to a broker under the buyer's control instead of to plaintiff. Relying upon *Robinson* and the Ninth Circuit's "target area" standing test, the Fifth Circuit held that the eliminated manufacturer's representative lacked standing to sue under the antitrust laws since his alleged injury was not competitive in nature:

> [T]he alleged anti-competitive conduct of Defendants was "targeted" at the attic fan and ventilator industry. The alleged illegality on the part of Defendant Cool Attic, even if proved, would have anti-competitive effect only upon that industry. The Plaintiff George would be damaged, if at all, by the ripple effects of the antitrust violation alleged. Congress did not intend the antitrust laws to provide a remedy in damages for all injuries which might be conceivably traced to an antitrust violation.

> . . . . .

> This Court is in agreement with Judge Singleton's holding in *Computer Statistics, Inc. v. Blair,* 418 F.Supp. 1339 (S.D. Tex.1976), that some anti-competitive effect is necessary to maintain an action under 15 U.S.C. § 13(c) ... Only if Plaintiff was in the same business and in competition with S.S. Kresge Co. or the Defendants would he have standing under 15 U.S.C. § 15 ... Like the Plaintiff in *Robinson v. Stanley Home Products,* Plaintiff George may well have suffered an economic loss as a result of Defendant's actions. The non-competitive nature of that loss, however, is fatal to George's attempt to maintain an action under 15 U.S.C. § 13(c).

587 F.2d at 272.

These cases, though decided before *Brunswick, McCready* and *Associated General,* are consistent with them. This court finds no case holding that a broker or manufacturer's representative eliminated by conversion to direct selling has standing to sue for an alleged violation of § 2(c). Accordingly, under both the general standards announced by the Supreme Court and the specific cases discussed above, Haff lacks standing to bring this action. Accordingly,

IT IS HEREBY ORDERED that the complaint be DISMISSED with prejudice in its entirety.