812 F.2d 538
 124 L.R.R.M. (BNA) 2989, 106 Lab.Cas. P 12,275,
1987-1 Trade Cases 67,470
 Doug EAGLE, Manuel F. Avila, Tony J. Avila, Luis Barranca
B., Manuel Antonio Bellido, Julio Oscar Ampie Chacon, Cosme
Muro Diaz, Eduardo Diaz, Jose Drummond, Luis Guido, John L.
Luz, et al., Plaintiffs-Appellants,
v.
STAR-KIST FOODS, INC., Ralston Purina, Inc., Castle & Cooke,
Inc., Defendants-Appellees.
 No. 85-6520.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 4, 1986.
Decided March 11, 1987.
 
 Barbara Enloe Hadsell and Ben Margolis, Los Angeles, Cal., for plaintiffs-appellants.
 Carlton A. Varner and Don T. Hibner, Jr., Los Angeles, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of California.
 Before ANDERSON and CANBY, Circuit Judges, and COPPLE,* District judge.
 J. BLAINE ANDERSON, Circuit Judge:
 
 
 1
 Eagle, et al. (hereafter "crewmembers" and/or "union" and/or collectively referred to as "class members") appeal from the district court's dismissal of their complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. The class members argue that the district court erred in concluding that they were not the proper parties to sue for damages as a result of Star-Kist's, etc., (hereafter "canneries") alleged antitrust violations.
 
 I. FACTS
 
 2
 Pursuant to section 4 of the Clayton Act, 15 U.S.C. Sec. 15, the class members alleged claims for treble damages against the canneries for violations of various sections of the Sherman Antitrust and Clayton Acts.
 
 
 3
 The class members can be divided into three categories:
 
 
 4
 1. Share Crewmembers--fishermen who have worked on a "share of the catch" arrangement aboard fishing vessels owned by individuals and entities who sell or deliver the vessel's catch of tuna to the canneries. Under this arrangement, the crewmembers are arguably vested with an ownership interest in a portion of the entire catch of the vessel. The vessel owners sell both their own shares and those of the crewmembers.
 
 
 5
 2. Per Tonnage Crewmembers--fishermen working under an arrangement whereby they are paid a price per ton for the fish caught which is thereafter sold to the canneries. The price per ton paid the crewmembers is adjusted up or down after the sale of the fish, according to the price determined and paid for by the canneries.
 
 
 6
 3. Union--membership dues paid by crewmembers in both categories to Local 33 are calculated as a percentage of the share of the catch paid to crewmembers for the net amount sold to the canneries at the price determined by the canneries.
 
 
 7
 The charges filed by the class members alleged violations of federal and state antitrust statutes, as well as tortious interference with prospective economic advantage. The central argument is that the canneries conspired to set tuna prices at artificially low levels resulting in a reduction of the wages paid to crewmembers and a loss of employment opportunities by them. The reduction in the crewmembers' wages, in turn, reduced the dues paid to the union.
 
 
 8
 The district court dismissed the crewmembers' antitrust claims because "under the Associated General Contractors v. California State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), multifactor analysis [the crewmembers and the union] are not the proper plaintiffs to sue for the alleged federal antitrust violations." The district court then declined to exercise pendent jurisdiction over the remaining state claims and dismissed them as well. The class members timely appealed. We affirm.
 
 II. DISCUSSION
 A. Standard of Review
 
 9
 The issue of status as a proper party in an antitrust suit is a pure question of law reviewed de novo by this court. Exhibitor's Service, Inc. v. American Multi-Cinema, Inc., 788 F.2d 574, 578 n. 4 (9th Cir.1986). See also Bubar v. Ampco Foods, Inc., 752 F.2d 445, 449 (9th Cir.), cert. denied, 472 U.S. 1018, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985).
 
 B. Analysis
 
 10
 Section 4 of the Clayton Act allows recovery of treble damages by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. Sec. 15(a). The language of this section is very broad and could be read to "afford relief to all persons whose injuries are causally related to an antitrust violation." Lucas v. Bechtel Corp., 800 F.2d 839, 843 (9th Cir.1986) (quoting In re Multidistrict Vehicle Air Pollution, 481 F.2d 122, 125 (9th Cir.), cert. denied, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973)). The "class of persons entitled to obtain such damages has been limited by the Supreme Court, however, through the doctrine of 'antitrust standing.' " Los Angeles Memorial Coliseum Comm'n v. NFL, 791 F.2d 1356, 1363 (9th Cir.1986).
 
 
 11
 "This doctrine of antitrust standing requires an inquiry beyond that performed to determine standing in a constitutional sense." Bubar, 752 F.2d at 448. As the Supreme Court has stated, "[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." Associated General Contractors, 459 U.S. at 535 n. 31, 103 S.Ct. at 907 n. 31. "This determination of antitrust standing requires an evaluation of the plaintiff's harm, the alleged wrongdoing by the defendant, and the relationship between them." Bubar, 752 F.2d at 448-49. The Supreme Court has specified certain factors which are to be evaluated on a case-by-case basis in order to determine whether a plaintiff, who has suffered an injury which bears a causal connection to the alleged antitrust violation, also satisfies the more demanding antitrust standing standard. The factors identified by the Court are:
 
 
 12
 (1) The nature of the plaintiff's alleged injury--whether it was the type the antitrust laws were intended to forestall;
 
 
 13
 (2) The directness of the injury;
 
 
 14
 (3) The speculative measure of the harm;
 
 
 15
 (4) The risk of duplicative recovery; and
 
 
 16
 (5) The complexity in apportioning damages.
 
 
 17
 Associated General Contractors, 459 U.S. at 538-45, 103 S.Ct. at 908-12; Bubar, 752 F.2d at 449.
 
 1. Nature of Alleged Injury
 
 18
 Under this factor, we must analyze the alleged injury to determine whether it is of the type that antitrust law was intended to forestall. Associated General Contractors, 459 U.S. at 540, 103 S.Ct. at 909.
 
 
 19
 The crewmembers and the union argue that Associated General Contractors does not confine protection of antitrust statutes to consumers or to purchasers or to competitors or to sellers. Instead, the right to recover treble damages under section 4 of the Clayton Act extends to "all who are made victims of the forbidden practices by whomsoever they may be perpetrated." Id. at 529-30 n. 19, 103 S.Ct. at 904 n. 19. This right to recover, they argue, extends to any employee (or any other group) that can prove damages with the requisite degree of directness and certainty.
 
 
 20
 This argument clearly ignores the case law that has limited the scope of the broad language of section 4 of the Clayton Act. The Supreme Court has held that antitrust laws were intended to "protect competition as a whole, not individual competitors." Lucas, 800 F.2d at 843. See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). "The requirement that the alleged injury be related to anticompetitive behavior requires, as a corollary, that the injured party be a participant in the same market as the alleged malefactors." Bhan v. NME Hospitals, Inc., 772 F.2d 1467, 1470 (9th Cir.1985) (citing Associated General Contractors, 459 U.S. at 538, 539, 103 S.Ct. at 908, 909). In other words, the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market. Exhibitor's Services, 788 F.2d at 579.
 
 
 21
 In the present case, in order to be a participant in the relevant market, the class members must have been either buyers or sellers of raw tuna. Both sides agree that the class members were not buyers. The alleged malefactors (the canneries) were the buyers. Thus, in order for the alleged injury to be of the type that antitrust laws were intended to forestall, the class members must prove that they were sellers in the raw tuna market. The district court held that the crewmembers were neither consumers nor competitors in the relevant market because they did not directly sell or purchase the tuna. Instead, they were employees of the vessel owners who negotiated and set the prices for the fish. The crewmembers argue that the method by which they were compensated made them sellers. They contend that "share" crewmembers actually own a percentage of the fish caught on a fishing voyage and are thereby sellers along with the vessel owners. Furthermore, the method by which "per tonnage" crewmembers' wages and the union's dues were calculated was so intertwined with the selling process that they, too, should be considered at least "indirect" sellers.
 
 
 22
 The district court pointed out, however, after examining the union contract agreements between the union and fishing vessel owners, that:
 
 
 23
 "[n]either the crew of any such vessel nor the union have any rights to control or direct the operation of said vessel or the selling price of fish caught by said vessel. The owner shall have the sole and exclusive authority to determine where and at what price and under what terms and conditions fish caught by said vessel shall be sold and where catches shall be delivered."
 
 
 24
 The crewmembers did not negotiate the prices with the canneries, the vessel owners did. The vessel owners are the requisite "sellers" in the relevant market, not the crewmembers or the union. Thus, the class members have not alleged the type of injury antitrust laws were intended to forestall, because the alleged anticompetitive conduct was directed at the vessel owners, not the crewmembers or the union.
 
 2. Directness of Injury
 
 25
 This factor requires us to examine the directness or indirectness of the causal connection between the alleged injury and the alleged violation. Associated General Contractors, 459 U.S. at 540, 103 S.Ct. at 909. The district court found that the vessel owners were the parties directly injured by the alleged violations and that the crewmembers and the union were not. The bases for its findings were: (1) any injury suffered by the class members was merely derivative of direct injury to the vessel owners, and (2) the vessel owners were the proper parties under the private attorneys' general theory.
 
 
 26
 a. Derivative Nature of Injury
 
 
 27
 The chain of causation between the injury and the alleged restraint in the market should lead directly to the "immediate victims" of any alleged antitrust violation. Generally, employees have been denied standing where their injuries were merely derivative of that of the employer. Id. at 541 n. 46, 103 S.Ct. at 910 n. 46 (and cases cited therein). The question then is whether the injuries in the present case (lost wages, lost business opportunities, and lost union dues) are direct injuries suffered by the class members or are derivative of the injuries suffered by the vessel owners.
 
 
 28
 The crewmembers and the union contend that they were directly injured because calculation of their wages and union dues was completely and inextricably intertwined with the artificially low selling prices of the raw tuna established by the canneries. They further argued that they were joint venturers with the vessel owners, and, therefore, directly injured by any conduct affecting the vessel owners.
 
 
 29
 Both arguments ignore the fact, admitted by the class members, that what exists between the vessel owners and the crewmembers is an employer-employee relationship. The vessel owners have complete control over negotiations of the sale of the fish. Once a sale has been completed, the crewmembers are paid their wages (after deducting expenses) either on a "share of the catch" or "per-ton" basis. Then, and only then, are the union dues calculated. Thus, any injury suffered by the class members is derived from any injury suffered by the vessel owners during the sale of the fish. "When the employer reacts to [a] loss by terminating employees, or when employees receive diminished salary or commissions, as a result of the employers' weakened market position, these employees suffer derivative injury only." Note, Employee Standing Under Section 4 of the Clayton Act, 81 Mich.L.Rev. 1846, 1859 n. 69 (1983). Furthermore, we find no evidence to indicate that the class members satisfy the requirements of joint venturers.[1]
 
 
 30
 b. Private Attorneys' General Theory
 
 
 31
 The primary legislative purpose underlying the Clayton Act was to make private attorneys general out of the private parties who sought damages under section 4 of the Clayton Act. Illinois Brick Co. v. Illinois, 431 U.S. 720, 746, 97 S.Ct. 2061, 2074, 52 L.Ed.2d 707 (1977). Therefore, "[t]he existence of an identifiable class of persons whose self interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the [plaintiffs] to perform the office of a private attorney general." Associated General Contractors, 459 U.S. at 542, 103 S.Ct. at 910. We find that the vessel owners are such an identifiable class with the requisite motivation to vindicate the public interest.[2] The justification for allowing the crewmembers and the union to bring the action is thereby diminished because they are more remote parties.
 
 
 32
 "But Sec. 4 has another purpose in addition to deterring violators and depriving them of 'fruits of their illegality' [citation omitted]; it is also designed to compensate victims of antitrust violations for their injuries." Illinois Brick, 431 U.S. at 746, 97 S.Ct. at 2075. The class members contend that this purpose would be fulfilled if they were allowed to bring suit. However, this purpose will also be achieved by allowing the more directly injured party, the vessel owners, to bring suit. Denying the class members standing in this case "is not likely to leave a significant antitrust violation undetected or unremedied." Lucas, 800 F.2d at 846 (quoting Associated General Contractors, 459 U.S. at 542, 103 S.Ct. at 911).
 
 3. Speculative Measure of Harm
 
 33
 Two factors have been identified by the Supreme Court as indicating the speculative nature of a damage claim: (1) the indirectness of the alleged injury, and (2) that the alleged effects may have been produced by independent factors. Associated General Contractors, 459 U.S. at 542, 103 S.Ct. at 910.
 
 
 34
 As we indicated above, the alleged injuries to the class members are indirect because they are derivative of the injuries suffered more directly by the vessel owners. Also, several independent factors exist that may add to the speculativeness of the injuries. For example, under the two methods for determining wages, the key factor affecting how much money is actually taken home by the crewmembers may not be the fish prices, but rather how much of the vessel's expenses were allocated to the crew's share, reducing the payment due them.
 
 4. Risk of Duplicative Recovery
 
 35
 The risk to be avoided under this factor is that potential plaintiffs may be in a "position to assert conflicting claims to a common fund ... thereby creating the danger of multiple liability for the fund." Id. at 544, 103 S.Ct. at 912.
 
 
 36
 The district court held that there is clearly a danger of duplication of evidence, facts, and damages due to the pending suit by the vessel owners in Gann alleging the same violations against the same canneries as alleged in this case. The canneries argue that this duplicative recovery was conceded by the class members in district court. There, they attempted to consolidate with Gann and argued that identical conduct by the same defendant (the canneries) is being complained of in each action and if consolidation was not allowed, "double recovery" would occur. The class members, on the other hand, contend that there is no danger of duplicative recovery because the Gann plaintiffs do not represent all the vessels on which the crewmembers have worked. This argument, however, does not dispose of the potential for at least some double recovery if we allow the class members to bring suit.
 
 5. Complexity in Apportioning Damages
 
 37
 The concern here is whether, if the plaintiff is allowed standing, any attempt to ascertain damages would lead to "long and complicated proceedings involving massive evidence and complicated theories." Id. at 544, 103 S.Ct. at 911 (quoting Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 493, 88 S.Ct. 2224, 2231, 20 L.Ed.2d 1231 (1968)).
 
 
 38
 The canneries argue apportioning damages will be excessively complicated because it will require an analysis of how much tuna and from whom the canneries would have bought if prices had been different; what expenses a vessel owner would have deducted; or what wages would have been paid if prices had been different. The class members counter that this would not be difficult to determine because detailed records of each voyage were kept and are available and the wages are determined by formulas clearly set out in readily available contracts.
 
 
 39
 The district court, taking both sides into consideration, held:
 
 
 40
 And then also there clearly is a likelihood of the complex apportionment of damages. The fishermen's award of damages really would have to be apportioned according to the vessel owners and the records of each fishing voyage during the time period addressed in the complaint because the share of the catch of the fisherman is dependent on the contract between the vessel owners and the defendants herein and the fisherman is entitled to a percentage of the catch based upon that contract.... Although plaintiffs allege that accurate records of these voyages exist, the fact remains that the damages are traced through the vessel owners.
 
 
 41
 We agree with the canneries and the district court. The determination and proof of damages in this case would be very complex.
 
 
 42
 Although "most cases will find some factors tending in favor of standing (to a greater or lesser degree), and some against (also in varying degrees), and a court may find standing if the balance of factors so instructs," Los Angeles Memorial Coliseum, 791 F.2d at 1363, in this case all of the factors tend against finding standing for the crewmembers and even more so against finding standing for the union. The district court's finding that the class members were not proper parties to bring this antitrust action is therefore
 
 
 43
 AFFIRMED.
 
 
 
 *
 Honorable William P. Copple, Senior United States District Judge, District of Arizona, sitting by designation
 
 
 [1]
 We find the admiralty cases cited by the class members to be inapposite
 
 
 [2]
 A related action, Gann v. Star-Kist, No. CV 85-0553-K, has been filed by the vessel owners against the canneries alleging the same antitrust violations alleged in the present case