YELLOW PAGES COST CONSULTANTS; Media Masters, Inc.; Tel–Ad Advisors, Inc.; Southern Directory Consultants, Inc.; Tel–Ad Advisors Southwest, Inc., Plaintiffs,

v.

GTE DIRECTORIES CORPORATION; GTE Directories Sales Corporation; GTE National Marketing Services Corporation; GTE Directories Publishing Corporation; GTE Directories Printing Corporation; and GTE Marketworld, Inc., Defendants.

No. C–89–0553 WHO.

United States District Court, N.D. California.

May 26, 1989.

Joel Linzner, Khourie, Crew & Jaeger, San Francisco, Cal., for plaintiffs.

Robert E. Cooper, J. F. d Stepp, Jr., William E. Wegner and Elizabeth A. Grimes, Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendants.

## OPINION AND ORDER

ORRICK, District Judge.

Plaintiffs, Yellow Pages Cost Consultants, Media Masters, Inc., Tel–Ad Advisors, Inc., Southern Directory Consultants, Inc., and Tel–Ad Advisors Southwest, Inc., brought this antitrust action against defendants, GTE Directories Corporation and its subsidiary corporations (hereinafter referred to collectively as "GTE/DC"), alleging violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, and state antitrust laws, as well as alleging pendent state causes of action for inducing breach of contract, interference with prospective business advantage, and unfair competition. The first antitrust claim, under § 2 of the Sherman Act, alleges that GTE/DC used its monopoly power in the yellow pages advertising market to obtain a monopoly in the separate consulting market by refusing to deal with plaintiffs in their capacity as agents for the advertisers. The second claim, under § 1 of the Sherman Act, alleges that GTE/DC's contracts with the local telephone companies, in conjunction with its refusal to deal with plaintiffs described above, amounted to a restraint of trade. The third claim, under § 1 of the Sherman Act, alleges that GTE/DC illegally tied its sale of yellow pages advertising to the utilization of its "free" consulting service.

GTE/DC filed motions for summary judgment on the issue of whether or not plaintiffs have antitrust standing; whether or not plaintiffs have suffered antitrust injury; and whether or not plaintiffs' damage study should be excluded. The Court finds that plaintiffs do not have antitrust standing and, therefore, the Court dismisses the antitrust claims. The antitrust injury issue is analyzed as part of the antitrust standing issue. The damage issue need not be resolved because of the Court's finding that there is no antitrust standing. The Court declines to accept pendent jurisdiction over the remaining state claims.

## I.

Plaintiffs are independent consultants who provide advertisers with advice on how to reduce the cost of their yellow pages advertising. Advertisers hire plaintiffs to work directly with GTE/DC as the advertisers' authorized agent. Plaintiffs are paid a percentage of the advertisers' savings. Their services have been well received due to the complex pricing structure of yellow pages advertising.

GTE/DC sells yellow pages advertising and publishes yellow pages directories. In April 1985, apparently in response to plaintiffs' successful ability to reduce the amount advertisers' spend on yellow pages advertising, GTE/DC announced that it would only sign contracts for yellow pages advertising with the advertisers and not with the advertisers' authorized agents such as plaintiffs. GTE/DC did not, however, do anything else to restrict advertisers' use of plaintiffs' services. This action prompted plaintiffs to file this antitrust suit.

## II.

The central issue before the Court is whether plaintiffs have antitrust standing. The United States Supreme Court broadly discussed five factors to evaluate on a case-by-case basis the question of whether a plaintiff has antitrust standing. The Ninth Circuit has formulated these factors as: (1) the nature of the plaintiffs' alleged injury—whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages. *Eagle v. Star–Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir. 1987), citing *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 538–40, 103 S.Ct. 897, 908–10, 74 L.Ed.2d 723 (1983). Courts should analyze antitrust standing questions by considering all the above factors, keeping in mind that not all the factors are required and not one factor is dispositive. *Lucas v. Bechtel Corp.*, 800 F.2d 839, 845 (9th Cir.1986).

### A.

■ The first factor, that the alleged injury be of the type that antitrust laws were intended to forestall, has as its natural corollary "that the injured party be a participant in the same market as the alleged malefactors." *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985).

GTE/DC first argues that plaintiffs do not satisfy this factor on the theory that plaintiffs and GTE/DC are not participants in the same market.[1] Plaintiffs contend

---

1. Judge Ingram, who had the case before it was transferred, issued an Order stating:

   [T]he court cannot find on the present record that plaintiffs and defendants are not in competition with each other. The material facts in the record are in conflict as to whether such competition exists. *Best Advertising Corp. v. Illinois Bell Co., supra,* and *Ad–Vantage Telephone Directory Corp. Consultants v. GTE Directories Corporation, supra,* would tend to support a holding that such competition does not exist, but this court finds a trial is necessary to determine whether the facts in

   this proceeding meet the criterion of those cases.

   Order filed Jan. 27, 1988, at 5–6.

   Despite plaintiffs' attempt to characterize this ruling as a finding that plaintiffs and GTE/DC are in the same market, Judge Ingram only found that the parties *could* be in the same market.

   The Court previously stated it would follow Judge Ingram's ruling. Reviewing the market issue in the antitrust standing context that was not before Judge Ingram, however, the Court

that a market exists for yellow pages consulting services separate from the yellow pages advertising market. Neither the existence of this consulting market nor plaintiffs' participation in it is in dispute. The only issue is whether or not GTE/DC, the seller of yellow pages advertising, is a participant in this separate consulting market.

Plaintiffs' argument that GTE/DC is in the consulting market fails to make both economic sense and common sense. GTE/DC sells yellow pages advertising to advertisers. Its goal, as is that of any business, is to sell as much advertising as it can. It has created a complex pricing structure for its advertisements. In response to this pricing structure, plaintiffs have created businesses that sell advice to the same advertisers on how to reduce the cost of their advertisements. The goals of these services are obviously in direct conflict with GTE/DC's goal of selling as much advertising as it can. Plaintiffs would want the Court to believe that in addition to selling advertising, GTE/DC also provides advice to advertisers on how to reduce its own sales. That argument simply defies both economic and common sense.[2]

The Supreme Court has dealt with the question of summary judgment in an antitrust case in which a claim did not make economic sense. In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), the Court held:

> When the moving party has carried its burden under Rule 56(c), its opponent must do more that simply show that there is some metaphysical doubt as to the material facts. In the language of

the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

> It follows from these settled principles that if the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary....

(Citations omitted.) In this case, because plaintiffs' argument that GTE/DC is in this consulting market makes no economic sense, plaintiffs' burden for showing specific facts is much greater than in an ordinary case.

GTE/DC presents a great deal of evidence to support the Court's conclusion that GTE/DC is not in the consulting market. Most of that evidence comes from representatives of plaintiffs themselves who acknowledge that it would be impossible for GTE/DC to provide the same service that plaintiffs provide. Lambert Stead, owner of Yellow Pages Cost Consultants, stated:

> GTE cannot make the same kind of cost-effective recommendations that we would make.

> For example, a GTE representative will never recommend to a customer that he reduce the size of his ad.... It's self-evident. He is a salesman. He makes a commission by selling.... Well, I have talked to a lot of clients, and

---

finds this issue can be resolved on the present record.

**2.** Common sense dictates that a seller of goods cannot and will not advise its customers to significantly reduce their purchases. This is especially true in a situation, as we have here, in which the salesperson works for a commission. In fact, if GTE/DC provided similar advice as the plaintiffs to reduce its advertisers' rates, then the need for the entire industry of independent consultants would not exist.

Simply put, if one was buying a car from a salesperson, would one expect to ask and re-

ceive worthwhile advice from that salesperson on how to bargain with him to reduce the price of the car? Of course not. The seller and the buyer are on opposite sides on the transaction. As Justice Douglas once stated, "That seems to us to be the common sense of the matter; and common sense often makes good law." *Peak v. United States*, 353 U.S. 43, 46, 77 S.Ct. 613, 615, 1 L.Ed.2d 631 (1957). It seems to the Court that common sense dictates that GTE/DC cannot be and is not in the market providing advice on how advertisers can lower their cost on advertisements purchased from GTE/DC.

I have yet to have one of them tell me that GTE representatives told him what we tell him.

Declaration of Mark L. Callister in Support of Defendants' Motion for Summary Judgment on Antitrust Standing, filed Apr. 24, 1989, Exh. 9 at 71–72 (hereinafter cited as "Callister Declaration"). Bertabelle Stead, President of Yellow Pages Cost Consultants, stated:

[T]he essential difference [between plaintiffs' service and the service offered by GTE/DC] is that [plaintiffs] can tell a client ways that they can reduce their program without hurting their program. I believe that that is not something a sales rep will do or should do, since they are supposed to first protect the revenue of their company, and of course they earn their income by what they sell.

Callister Declaration, Exh. 3 at 38. Harding O'Riley, President of Media Masters, also acknowledges this difference. He answered the following question:

Q: Is it a fair characterization of your perspective that your company offers independent consulting on yellow pages purchases as opposed to GTE–DC which is essentially engaged in a sales effort?

A: Yes.

Callister Declaration, Exh. 7 at 65. The record contains many other such statements that clearly indicate the obvious—that GTE/DC cannot sell a product and at the same time give advice on how to buy the product cheaper. One of plaintiffs' own sales brochures states this point: "It goes without saying, that no sales person, no matter which industry they represent, would willingly divulge information that might cause a customer to buy less product or service." Callister Declaration, Exh. 13 at 93.

In addition, evidence submitted by plaintiffs themselves demonstrates that advertisers do not think that plaintiffs and GTE/DC are in the same market. Jerry Miyamoto, a customer of one of the plaintiffs, wrote:

[Plaintiff's representative] pointed out many cost savings ideas which were not explained to me by the yellow pages salesman. Since the salesman probably worked on a commission I can understand why he didn't try to help me save money.

Declaration of Joel Linzner in Opposition to GTEDC's Motions for Summary Judgment Re Standing, filed Apr. 7, 1989, Exh. 17 at 1 (hereinafter cited as "Linzner Declaration"). There are sixteen other letters in the record from advertisers that expressed similar sentiments. Linzner Declaration, Exh. 17.

From the evidence reviewed, the Court finds that GTE/DC has shown that they are not in the consulting market in which plaintiffs operate. The burden of proof, with the higher standard outlined by *Matsushita*, now shifts to plaintiffs to show enough specific facts to survive summary adjudication of this issue.

Plaintiffs rely on, as their support for GTE/DC being in the consulting market, documents from GTE/DC's internal files that refer to plaintiffs as "competitors," in a generic sense rather than in an antitrust sense, and documents that amount to nothing more than mere "puffing" on the part of GTE/DC. Plaintiffs submit an internal GTE/DC memorandum written by D.E. Ritenour, Northwestern Regional Manager of GTE Directories Corporation, to A.J. Knight. The memorandum contains a section under the heading "Competition," which contains a reference to "Agency activity." Linzner Declaration, Exh. 20, at 1. These are the agencies that include plaintiffs. There are several similar memoranda in the record. This listing of agencies as competitors, by a regional manager, is clearly made in the generic sense, as one would call anyone who was working in opposition to one's goal of maximizing sales. No reference is made to the agencies being in the same market as GTE/DC or the agencies taking business from GTE/DC in the consulting market. The word was clearly used to denote a rival, someone working against one's interest, but not the more technical antitrust competitor.

Plaintiffs next point to GTE/DC documents entitled "Domestic Sales Division Profile." Linzner Declaration, Exhs. 26–27. These documents range in time from 1981–82 through 1983–84. These reports appear to be filled out by regional sales managers for GTE/DC. Under section IIA of the form, the manager is supposed to list the "major directory publishers competing for business in the area served by your division." *Id.* The manager for the Portland division included a couple of agencies in this section as competitors. Again, because the GTE/DC form requested the listing of only publishers of yellow pages, which would be the more technical competitor in the antitrust sense, the manager's listing of agencies reflects a more generic use of the term "competitor." Obviously, the manager simply assumed a "competitor" was anyone who hurt his bottom line. This is a much broader definition than the antitrust laws encompass.[3] Therefore, these documents are not probative of the fact that GTE/DC operates in the consulting market, but only of the fact that plaintiffs are on opposite sides from GTE/DC of a seller/buyer relationship.

The next evidence that plaintiffs present can be grouped together as evidence that amounts to nothing more than sales "puffing" on the part of GTE/DC. In response to plaintiffs' success at advising advertisers on how to lower their rates, GTE/DC tried to convince advertisers that it could be trusted in its business dealings. Several letters were approved to be sent to advertisers. Linzner Declaration, Exh. 11, at GG–JJ. One such letter states in part: "Please keep in mind that GTE yellow pages provides a FREE advertising consulting service and has done so for over forty years." *Id.* at GG. Another authorized form letter states:

GTE Directories Corporation invites you to handle your yellow pages advertising directly with one of our trained professional representatives. As you know, there are no service fees, commissions or other hidden charges when you place your advertising directly with GTE Directories Corporation. Some agencies, however, will charge you an extra fee to do exactly what GTE Directories Corporation can do.

*Id.* at HH. In addition to these letters, plaintiffs present advertisements by GTE/DC that carry basically the same message as the letters. Linzner Declaration, Exhs. 12–13.

The claims made by GTE/DC in the letters and advertisements are nothing more than an attempt to convince advertisers to trust GTE/DC salespeople. It is similar to a used car dealer referring to himself as "honest Abe." The advertisers, however, did not believe GTE/DC's characterization of themselves. They knew GTE/DC's goal was to maximize their sales rather than advise its customers on how to reduce their bill. Linzner Declaration, Exh. 17. GTE/DC's statements do not, therefore, amount to enough to put the question of whether GTE/DC operated in the consulting market in any doubt.[4]

---

3. Plaintiffs also point to the minutes from a GTE/DC regional marketing meeting in which agencies are referred to as competitors. Linzner Declaration, Exh. 28 at D. This again is a generic use of the term that does not in any way indicate that GTE/DC competes in the same market as plaintiffs in an antitrust sense.

4. In addition to the above, plaintiffs point out statements made by its two experts, Nelson R. Lipshutz and Robert G. Harris. Lipshutz states that GTE/DC is in the consulting market. He relies, however, on the same evidence discussed above that the Court finds not persuasive. Linzner Declaration, Exh. 8. Lipshutz also reveals the flaw in plaintiffs' position in paragraph 11 of his declaration in which he states that after a consultant had advised an advertiser, a GTE/DC salesperson would call on the customer to rebut the advice. This was obviously done to sell more advertisements, not to offer better advice on how to further reduce the advertiser's cost. Linzner Declaration, Exh. 8 at 5.

Harris also states that GTE/DC is in the consulting market, but again undermines his own argument. Linzner Declaration, Exh. 9 at 4–5. Harris acknowledges that plaintiffs and GTE/DC have opposite incentives. GTE/DC's incentive is to increase the price of the advertisement, whereas plaintiffs' incentive is to decrease the price of the advertisement. To get around this hurdle, he tries to equate the situation in this case to that of the travel agent and the airline in which the agent and the airline compete in the reservation market. There is a significant difference between these two situations, which

Applying the high standard of *Matsushita*, the Court finds that the above evidence does not create a doubt larger than the metaphysical doubt found to be insufficient in *Matsushita*. Therefore, the Court finds that GTE/DC is not a participant in the consultant market in which plaintiffs operate.

The first factor of the antitrust standing test is actually whether the injury plaintiff suffered is one antitrust laws were intended to protect. The market question is a corollary to that. Thus, the Court directs its inquiry to the question of whether plaintiffs' injury was one the antitrust laws were designed to protect, notwithstanding the fact that the parties do not operate in the same market.

Plaintiffs first antitrust claim is a § 2 Sherman Act claim alleging that GTE/DC used its monopoly power in the yellow pages advertising market to gain a monopoly in the consulting market by refusing to deal with plaintiffs. Because the Court has determined as a matter of law that GTE/DC does not participate in the consulting market, it could not be gaining a monopoly in that market. Therefore, plaintiffs injury, if any, under this claim is clearly not of the type the antitrust laws were designed to protect.

The second claim, under § 1 of the Sherman Act, alleges that a restraint of trade occurred when GTE/DC both refused to deal with plaintiffs as mentioned above and when GTE/DC conspired with the local telephone companies. The claim is presented as an aggregate of these two events. As discussed above, GTE/DC cannot create a monopoly in a market in which it does not operate and, therefore, this claim does not present injury that the antitrust laws were designed to prevent.

The third claim is a tying claim under § 1 of the Sherman Act. Plaintiffs allege that GTE/DC tied the selling of its yellow pages advertising to the "utilization" of its free consulting service. It is well settled that in order to establish an unlawful tying arrangement the following elements must be met: (1) a plaintiff must demonstrate the existence of two distinct products or services; (2) the sale of the tying product or service is conditioned on the purchase of the tied product or service; (3) the defendant has sufficient economic power in the market for the tying product to appreciably restrain competition in the market for the tied product; and (4) the amount of commerce involved in the market for the tied product is not insubstantial. *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 540 (9th Cir.), *cert. denied*, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1983).

There are two reasons that plaintiffs' tying claim is not one that presents an injury that the antitrust statutes were designed to prevent. First, and most important, GTE/DC does not participate in the consulting market and, therefore, cannot sell a tied product or service in that market. Second, even if GTE/DC did provide a product or service in that market, it does not condition buying yellow pages advertising on buying its consulting service. This is true for two reasons. First, GTE/DC simply requires the advertiser, who is the party responsible for paying the advertising bill, to sign the contract for advertising. GTE/DC does not prohibit advertisers from purchasing advertisements if they have hired one of the plaintiffs as consultants. Second, GTE/DC does not sell a consulting service. By the evidence relied on by plaintiffs themselves to support its market claim, GTE/DC supposedly con-

Harris even points out. In the travel agent situation, the travel agent's incentive is the same as the airline because the travel agent is being paid by the airline and not the customer as happens in the present case. In attempting to address this extremely significant difference, Harris actually proves that GTE/DC is not in the consulting market.
Harris argues that it was GTE/DC's "hard" selling practices that created a need for plaintiffs'

services. Therefore, if that is true, how can GTE/DC hard sell customers and at the same time, with the same salespeople, offer advice that directly contradicts its hard sell. It cannot. Therefore, the Court finds that Lipshutz' and Harris' statements do not add anything to the argument that GTE/DC is in the consulting market.

sults without charging for the service. Therefore, this is not the type of tying arrangement against which the antitrust laws were designed to protect.

Plaintiffs rely heavily on the Second Circuit opinion in *Crimpers Promotions Inc. v. Home Box Office, Inc.,* 724 F.2d 290 (2d Cir.1983), to support their argument that they have antitrust standing. That case, however, is easily distinguished from this situation. *Crimpers* involved a plaintiff who organized a cable television trade show. Defendants, Home Box Office and Showtime, both cable networks, were charged in the complaint with conspiring to create a boycott of the trade show organized by plaintiff so that they could maintain their control over producers and television stations. Crimpers' antitrust claims and the theories supporting those claims were not predicated on Crimpers proving that plaintiff and defendants were in the same market.

The situation in the present case is very different. In order to succeed on their antitrust claims, plaintiffs must prove that GTE/DC is in the same consulting market as plaintiffs. Plaintiffs want it both ways. They want the Court to find that GTE/DC is in the same market as plaintiffs and at the same time find antitrust standing based on a case in which the parties were not in the same market. Therefore, plaintiffs' reliance on a case in which standing was found when plaintiff and defendants were not in the same market is misplaced.[5]

Summarizing the discussion above, the Court finds that GTE/DC is not a participant in the consulting market. Moreover, the antitrust laws were not designed to protect against the type of injury alleged by plaintiffs' claims. Thus, this first factor under the antitrust standing test supports the finding that plaintiffs do not have antitrust standing.

## B.

■ The second factor to consider in determining antitrust standing is the direct-ness of the antitrust injury. When considering this factor it is proper for the Court to address (1) whether the alleged injury is derivative of a direct injury to another, and (2) if there is another class of individuals who are proper parties under the private attorneys' general theory. *Eagle,* 812 F.2d at 541.

GTE/DC argues that the injury to plaintiffs was indirect because it was derivative from the injury, if any, to the advertisers. Plaintiffs argue that they suffered direct injury. The Court finds that GTE/DC's argument is the most persuasive based on plaintiffs' own allegations. Plaintiffs allege that as agents of the advertisers they are employed to assist advertisers in reducing their advertising cost. They charge a percentage of the amount saved by the advertisers. Plaintiffs further allege that because they educate advertisers regarding the costs and benefits of various forms of yellow pages advertisements, GTE/DC is less able to abuse any monopoly power it might have in the advertising market, thus saving the advertiser money. Therefore, the injury that flows from GTE/DC's alleged misconduct is that advertisers will have to pay more than they would have had to pay had GTE/DC not acted improperly. Thus, the direct injury is to the advertiser.

Plaintiffs suffer indirect injury. Their injury stems from the injury suffered from the advertisers. Because plaintiffs are paid with a percentage of the savings to the advertiser, plaintiffs suffer injury only if the advertiser is injured by not saving money due to GTE's misconduct. This injury is clearly derivative from that suffered by the advertisers.

Addressing the prong that determines whether another class of potential plaintiffs could be proper parties under the private attorneys' general theory, it is obvious that the advertisers would be proper plaintiffs under this theory. Any decrease in competition in either the yellow pages con-

---

**5.** This distinction applies to the other cases cited by plaintiffs in which the parties were not in the same market. *See Los Angeles Memorial Coliseum Commission v. National Football League,* 791 F.2d 1356 (9th Cir.1986); *Brokers Assistant v. Williams Real Estate Co., Inc.,* 646 F.Supp. 1110 (S.D.N.Y.1986).

sulting market or the advertising market would harm the advertisers who use both these services. Increase in competition in either market would, of course, benefit the advertisers.

On the other hand, increased competition in the consulting market would not be in plaintiffs' best interest because it would lead to the need for plaintiffs to charge lower rates to compete with each other. Likewise, increased competition in the advertising market would also harm plaintiffs. If increased competition took place in the advertising market, then lower rates would be charged by the publishers of the directories and there would be less of a need for plaintiffs' services.

Thus, if there are any antitrust theories that can be alleged, the advertisers would be the proper class of plaintiffs to claim antitrust injury. Moreover, plaintiffs' injury, if any, is indirect and derivative from that possibly suffered by the advertisers. Therefore, this second factor supports the finding that plaintiffs do not have antitrust standing.

### C.

■ The third factor used in determining the standing issue is whether damages are too speculative. Two factors have been identified as indicating the speculative nature of a damage claim: (1) the indirectness of the injury, and (2) the possibility that the alleged injury may have been produced by independent factors. *Eagle*, 812 F.2d at 542. Plaintiffs' indirect injury has been addressed above.

The possibility of independent factors causing plaintiffs' injury were noted by plaintiffs' own damage expert, but were ignored for the purposes of calculating the damages. Callister Declaration, Exh. 12, at 81. These independent factors include: (1) how plaintiffs' marketing is conducted; (2) how many sales people it puts into the field; (3) the particular area in which those sales people work; (4) the portfolio of advertising that an advertiser currently contains in a book; (5) the degree of competition with other agencies; and (6) the economy of the region in question. *Id.*

Plaintiffs argue that their damages are not speculative. They cite letters showing that they lost customers because of GTE/DC's action. This might be true, but the resulting damage from those lost customers remains speculative. The only other evidence presented by plaintiffs is that one of plaintiffs' balance sheets reflected a significant drop in revenues in the time period after GTE/DC decided to deal directly with advertisers. The amount attributable to GTE/DC's action is not addressed, and even plaintiffs' own damage expert admitted that other factors could have caused such a drop. Thus, plaintiffs' damage expert reveals that plaintiffs' damage claims are speculative. This factor, therefore, supports the finding that plaintiffs' do not have antitrust standing.

### D.

■ The fourth factor used in determining antitrust standing is whether there is a risk of duplicative recovery. This is a classic case in which the risk of duplicative recovery is great. As already discussed, the advertisers themselves have a possible claim for any alleged wrongdoing by GTE/DC. The advertisers harm, if any, is in the form of GTE/DC's overcharging and, therefore, they would collect the amount they were overcharged. Plaintiffs' harm, if any, is a percentage of the amount the advertisers were overcharged. If plaintiffs were to collect, plaintiffs and the advertisers would be asserting conflicting claims against the same monies. This is exactly what this factor was meant to protect against. *Eagle*, 812 F.2d at 542. Indeed, in their opposition papers, plaintiffs present no real argument against this factor. This factor further supports the Court's finding that plaintiffs do not have antitrust standing.

### E.

■ The fifth factor used in determining antitrust standing is whether apportioning damages is too complex. This factor is extremely subjective given the long list of factors that plaintiffs' damage expert outlined. It is clear to the Court that any

attempt to apportion damages would break down to a simple guessing game. Therefore, this factor as well supports the finding that plaintiffs do not have antitrust standing.

Reviewing all five factors, the Court finds that plaintiffs do not have antitrust standing in this case. They might have suffered some type of injury, but that injury is not redressed under the antitrust laws. Accordingly,

IT IS HEREBY ORDERED that:

1. GTE/DC's motion for summary judgment on the issue of antitrust standing is granted.

2. The Court declines to accept pendent jurisdiction on plaintiffs' remaining state claims.