951 F.2d 1158
 60 USLW 2449, 1991-2 Trade Cases P 69,665
 YELLOW PAGES COST CONSULTANTS, INC.; Media Masters, Inc.;
Tel-Ad Advisors, Inc.; Southern Directory
Consultants, Inc., Plaintiffs-Appellants,
v.
GTE DIRECTORIES CORPORATION; GTE Directories Sales
Corporation; GTE National Marketing Services Corporation;
GTE Directories Publishing Corporation; GTE Directories
Printing Corporation; GTE Marketworld, Inc., Defendants-Appellees.
 No. 89-15796.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 14, 1991.
Decided Dec. 24, 1991.
 
 Paul J. Kaleta, Swidler & Berlin, Washington, D.C., Joel Linzner, Khourie, Crew & Jaeger, San Francisco, Cal., for plaintiffs-appellants.
 C. Douglas Floyd, Pillsbury, Madison & Sutro, San Francisco, Cal., for defendants-appellees.
 Appeal from the United States District Court for the
 Northern District of California.
 Before: FLETCHER, NORRIS and NOONAN, Circuit Judges.
 WILLIAM A. NORRIS, Circuit Judge:
 
 
 1
 Defendants-Appellees GTE Directories and related corporations ("GTE") publish yellow pages directories. In those areas where it publishes the yellow pages directory as the local phone company, GTE occupies a huge market share of the yellow pages advertising market: over 98% in Anchorage, Oahu, and Tampa; 95% in Las Vegas; 77.2% in Long Beach, California. GTE salespersons offer advertisers advice on the form and content of their advertisements and place such advertisements with relevant GTE directories. GTE does not bill advertisers separately for such advice, but builds the cost into its rate structure.
 
 
 2
 Plaintiffs-Appellants are several distinct consulting firms that offer advice to businesses on advertising effectively and efficiently in yellow pages directories. For convenience, we refer to appellants Yellow Page Cost Consultants, Media Masters, Inc., Tel-Ad Advisors, Inc., and Southern Directory Consultants, Inc., as "Consultants." These Consultants advise businesses on the content and form of their advertisements in yellow pages directories. Prior to a change in GTE policy, the Consultants also placed such advertisements with directories published by GTE.
 
 
 3
 In soliciting the business of advertisers, the Consultants point to their ability to fashion the most economical use of the yellow pages directories. Consultants maintain that GTE's vast market shares allow it to maintain a Byzantine pricing structure such that ads of the same size that look virtually identical and cost the same to publish vary in price by 100% or more.[1] As former sales persons for GTE, appellants tell advertisers that they can design and place ads with GTE efficiently. Indeed, Consultants charge advertisers according to the savings they provide. Collectively, Consultants not associated with GTE saved advertisers a total of $3,000,000 per year.
 
 
 4
 The instant action arose from GTE's announcement that it would end its decades-old practice of letting consultants order, place, and process yellow page advertisements on behalf of advertisers. Subsequently, some of Consultants' customers canceled their contracts, citing the added inconvenience this change created.
 
 
 5
 Consultants filed suit against GTE, seeking relief for violations of sections 1 and 2 of the Sherman Act and various state laws. The first antitrust claim, under § 2, alleged that GTE exploited its monopoly power in the yellow pages advertising market to obtain a monopoly in the separate consulting marketing by refusing to deal with consultants. The second claim, under § 1, alleged that GTE's contracts with local telephone companies, combined with the refusal to deal with consultants, amounted to an unreasonable restraint of trade. The third claim, under § 1, alleged that GTE illegally tied the sale of advertising in its yellow pages directories to utilization of the consulting services offered by its salespersons.
 
 
 6
 In its first motion for summary judgment, GTE argued that there was no separate market for consulting services for yellow pages advertisers and, alternatively, that if such a market existed, GTE did not compete in it. GTE argued that the "key fact" was that GTE could not compete with consultants because the advice consultants offered was "independent" and designed to "maintain the effectiveness of ... advertising for less money," see Excerpts of Record ("ER") at 52. Although the motion itself did not explicitly mention "standing," Judge Ingram raised the question of antitrust standing at argument, and GTE opined that the Consultants lacked standing. Judge Ingram denied GTE's motion for summary judgment, specifically noting that triable issues of fact remained on whether GTE and Consultants were competitors.[2]
 
 
 7
 Upon transfer of the case to Judge Orrick, GTE renewed its motion for summary judgment. GTE argued that the relevant market for Consultants' services was that of offering independent advice on reducing yellow pages costs and that it could not compete in the market so defined because its salespersons were not independent of it. Consultants replied that the relevant product market did not turn on independence, but consisted of "advice to advertisers, regarding the form, content and location of their ads as well as placement of the ads." ER 134.
 
 
 8
 Judge Orrick awarded summary judgment to GTE on the ground that Consultants had failed to present triable issues of fact on antitrust injury and antitrust standing; he also declined to accept jurisdiction over the pendent state law claims. See Yellow Pages Cost Consultants v. GTE Directories, 716 F.Supp. 1306, 1308 (N.D.Cal.1989).
 
 
 9
 We review de novo the district court's summary judgment, "view[ing] the evidence presented in the light most favorable to the [non-moving parties] to determine if there is a genuine issue of material fact and, if not, whether [the moving party] is clearly entitled to prevail as a matter of law." Chelson v. Oregonian Publishing Co., 715 F.2d 1368, 1370 (9th Cir.1983).[3] We reverse.I
 
 
 10
 We think the district court erred in concluding that Consultants and GTE do not compete. The court stated that most of the evidence that showed that GTE did not compete came from Consultants' statements that advertisers could get a better deal by using their services rather than relying only on GTE's salespersons. 716 F.Supp. at 1309. This evidence does not show that Consultants offer different services from GTE; it only shows that Consultants think they offer better services.
 
 
 11
 Consultants offer considerable evidence that they compete in the service market of advising advertisers regarding the form, cost, content and location of yellow pages advertisements and, prior to GTE's refusal to deal with consultants, placing the ads in yellow pages publications. For instance, a GTE policy manual included under "Competition-Countering Guidelines" several procedures "proven effective" in combatting competition. The manual recommended that the following letter be sent to advertisers who had retained consultants for the prior year's directory:
 
 Dear Customer:
 
 12
 GTE Directories Corporation invites you to handle your yellow pages advertising directly with one of our trained professional representatives. As you know, there are no service fees, commissions, or other hidden charges when you place your advertising directly with GTE Directories Corporation. Some agencies, however, will charge you an extra fee to do exactly what GTE Directories corporations can do.
 
 
 13
 GTE also recommended that its employees tell advertisers, "We'll work with you to modify, streamline and yes, even reduce your yellow pages advertising program...." ER 531. GTE officials also gave deposition testimony that they would work to reduce an advertising program if advertisers wanted to do so.
 
 
 14
 Against this evidence, GTE places great weight on the Consultants' method of calculating its fees. "The simple fact that plaintiffs were paid as a percentage of reduced expenditures," it argues, "demonstrates eloquently that layout and design had nothing to do with their efforts to compete." Brief of Appellee at 14. At best, GTE's argument is one inference available to the trier of fact. A trier of fact might also reasonably conclude that the different billing practices reflect different strategies for marketing services that are essentially identical. Consultants' unusual method of billing accords with their claim that they can reduce overall expenditures on yellow pages advertising without compromising effectiveness. GTE bills differently. The president of a GTE subsidiary admitted that the cost of its "free advertising consulting service," as GTE fashioned its service in letters to advertisers, was covered by the rates for its yellow pages advertisements. GTE has cited no authority that a trier of fact could not conclude that otherwise identical services are distinct because one party charges for them as part of a package of products and the other charges for them separately in accordance with a different marketing scheme.
 
 
 15
 Similarly, we disagree with the district court's contention that a trier of fact could not find that GTE and Consultants compete in the market for yellow pages' advice because they do not supply advertisers with identical recommendations. The district court implicitly defined the scope of the market for yellow pages consulting according to the content of the recommendations offered. It therefore defined the market for Consultants services as the sale of "advice to advertisers on how to reduce the cost of their advertisements." 716 F.Supp. at 1309. A trier of fact, however, could reasonably accept the analysis offered by one of Consultants' experts:
 
 
 16
 The fact that ... [GTE] generally advises its customers to spend greater amounts for Yellow Pages advertising, while Yellow Pages consultants generally advise their customers to spend lesser amounts, does not put GTEDC and Yellow Pages consultants in separate markets. At any given time, some stockbrokers are telling their clients to sell, while other stockbrokers are telling their clients to buy. Yet both bull and bear stockbrokers are competing in a single market for investment advisement services.
 
 
 17
 ER 331.
 
 
 18
 Finally, at a more abstract level, we disagree with the district court's reasoning that GTE's references to Consultants as competitors denoted only a "rival, someone working against one's interest, but not the more technical antitrust competitor." 716 F.Supp. at 1310. As we have noted before, the "field of competition [includes] ... the group or groups of sellers who have actual or potential ability to deprive each other of significant levels of business." Thurman Industries, Inc. v. Pay N' Pak Stores, Inc., 875 F.2d 1369, 1374 (9th Cir.1989) (declining to recognize "home center stores" as distinct market when other retail stores offered some similar goods even if not the full range of goods and services available at home center stores). Moreover, Consultants also serve the function of competitors we identified in U.S. v. Syufy Enters., 903 F.2d 659, 662-63 (9th Cir.1990), of imposing "an essential discipline on producers and sellers of goods to provide the consumer with a better product at a lower cost ...."
 
 II
 
 19
 Having concluded that Consultants suffered antitrust injury, we turn to GTE's argument that other factors "confirm" their argument that the Consultants are not appropriate antitrust plaintiffs.[4] We conclude that these remaining arguments confirm that Consultants are indeed appropriate antitrust plaintiffs.
 
 
 20
 First, GTE contends that Consultants have not suffered direct injury because any injury to Consultants was derivative of injury to their clients. The district court held that the "injury that flows from ... [GTE's refusal to deal] is that advertisers will have to pay more than they would have.... [but because Consultants] are paid with a percentage of the savings to the advertiser, [they] suffer injury only if the advertiser is injured...." 716 F.Supp. at 1313.
 
 
 21
 We disagree. As we stated in R.C. Dick, "[d]irectness in the antitrust context means 'close in the chain of causation.' " 890 F.2d at 147 (quoting Associated General Contractors, 459 U.S. at 540, 103 S.Ct. at 909). There could hardly be a closer causal link than the one between GTE's refusal to let Consultants place advertisements for their clients and their clients' canceling contracts in letters to Consultants that mention the GTE policy change. Just as we reject GTE's argument that the method of payment resolved the competition issue, we reject the notion that Congress intended antitrust standing to turn on the method of payment used by different market actors. Such a notion would effectively deny standing to all those who charge a share of the savings they provide others.
 
 
 22
 The method of payment does not change our earlier analysis of retaliatory refusals to deal in Chelson v. Oregonian Publishing Co., 715 F.2d 1368 (9th Cir.1983), in which we reversed summary judgment denying standing to newspaper dealers to sue a publisher who refused to deal with those who distributed a competing advertising insert. In Chelson, we remanded to the district court to determine if the targets of a boycott would have worked with others "but for the actions of [appellees]" because there were disputed issues of fact between the parties over whether an agreement would have been reached. Chelson, 715 F.2d at 1372. Although GTE may dispute the extent of losses its refusal to deal inflicted, there appears to be no issue of fact that Consultants suffered some loss as a result of GTE's refusal to deal with them.
 
 
 23
 The addition of specific intent to this direct injury also makes antitrust standing appropriate. See Reazin v. Blue Cross & Blue Shield of Kansas, 899 F.2d 951, 963 (10th Cir.1990); R.C. Dick, 890 F.2d at 146. An internal memorandum of GTE marked "highly confidential" discusses "agency activity" under the heading "competitive environment" and recommends "a very aggressive approach if not refus[ing] to deal with them altogether." ER 762. GTE does not contest specific intent on appeal.
 
 
 24
 We next consider the character of damages, including "the risk of duplicative recovery, the complexity of apportionment, and their speculative character." R.C. Dick, 890 F.2d at 146. The district court expressed a concern that Consultants and advertisers could claim the same damages. See 716 F.Supp. at 1314. One example, however, dispels this fear. An advertiser with a yellow pages advertising budget of $1,000 might pay that entire sum to GTE rather than use Consultants because of the inconvenience caused by GTE's refusal to let Consultants place ads with them on its behalf. Had GTE allowed Consultants to place the ads, causing the advertiser to use Consultants, it might have paid only $500 to GTE and $200 to Consultants and retained $300 itself. The Consultants would recover the $200 in the instant suit; the advertiser might recover $300 in a subsequent suit. From this perspective, Consultants' antitrust action presents no unusually difficult apportionment problems.
 
 
 25
 The district court also applied too strict a standard in holding that Consultants' damages were speculative. Despite evidence that particular clients canceled their contracts with Consultants, as well as evidence of a decline in overall revenues, the court held that the Consultants' claims were speculative because their expert conceded that other factors might have contributed to the revenue drop. See 716 F.Supp. at 1314. This holding disregards our rule that "[an antitrust] plaintiff [attempting to establish the amount of damages] need not negative all possible alternative explanations for his decline in profits." Knutson v. Daily Review, Inc., 548 F.2d 795, 811 (9th Cir.1976). See also Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946) (jury may base antitrust damages on "just and reasonable estimate" when defendant's actions have prevented more precise computation).
 
 
 26
 Finally, we disagree with the district court's conclusion that advertisers were more appropriate antitrust plaintiffs because they were "persons more obviously suffering antitrust injury" and therefore better poised to vindicate the public interest in antitrust enforcement.[5] The district court held that the advertisers were more interested than Consultants in increasing competition in the yellow pages advertising market, since increased competition and thus, presumably, less confusing rate structures, would reduce the demand for Consultants' services. See 716 F.Supp. at 1313. This would prove far too much: since every competitor ideally prefers not greater competition, but that it reap the benefits of monopoly, no competitor would ever have standing under the district court's reasoning.
 
 
 27
 Such analysis mistakes why we consider the factor of more appropriate plaintiffs. The factor is not, as the analysis would suggest, an exercise in identifying the select, in the style of a 17th Century Puritan village and its theological musings. It is instead an attempt to ensure antitrust violations will, in fact, be identified and remedied in our own Twentieth Century world of imperfect competition as understood by modern economics. In Ostrofe v. H.S. Crocker Co., 740 F.2d 739 (9th Cir.1984), we held that a blacklisted manager had standing to challenge restraint on competition in the product market for labels even though that restraint presumably hurt others as well. We did not grant Ostrofe standing in recognition of his virtue for exposing the price rigging conspiracy there.
 
 
 28
 Presumably others were also victimized by the price fixing conspiracy, but it is unlikely that any other victim with knowledge of the conspiracy sustained a kind of injury that would give him equal incentive to bring the antitrust violator to account. Denying standing to one in the position of Ostrofe and others similarly situated is "likely to leave a significant antitrust violation undetected or unremedied."
 
 
 29
 Ostrofe, 740 F.2d at 747 (quoting Associated General Contractors, 459 U.S. at 541, 103 S.Ct. at 910). Similarly, failure to allow Consultants standing would raise a serious danger that alleged antitrust violations would go unremedied. We refuse to rely on the speculation that some individual advertiser would have lost sufficient money from GTE's refusal to deal with Consultants to provide it with an adequate incentive to bring suit.
 
 III
 
 30
 Consultants suffered antitrust injury as competitors with GTE for providing consulting services to advertisers in yellow pages directories. No other relevant factor counsels against finding standing. Accordingly, the judgment of the district court is VACATED, and the case is REMANDED for proceedings consistent with this opinion.
 
 
 
 [1]
 Appellants allege that this rate structure amounts to anticompetitive conduct, including price discrimination. We express no opinion as to the merits of these claims
 
 
 [2]
 Judge Ingram's subsequent rulings strongly suggest that he viewed GTE's first summary judgment motion as raising the question of Consultants' antitrust standing. In response to GTE's subsequent motion to dismiss, arguing that Consultants lacked antitrust standing because they did not compete in a relevant market, Judge Ingram refused to consider the motion because it came after the motion cut-off date and "contain[ed] material raised in prior summary judgment motions denied by this court." ER 90-91
 
 
 [3]
 Accordingly, the facts as stated in this opinion are ones that are either not contested for summary judgment purposes or ones that a trier of fact could find based on the evidence proffered in support of, or in opposition to, the motion for summary judgment
 
 
 [4]
 In determining whether a party has standing to bring an antitrust suit, we examine five factors:
 
 
 [1]
 The specific intent of the alleged conspirators;
 
 
 [2]
 The directness of the injury;
 
 
 [3]
 The character of the damages, including the risk of duplicative recovery, the complexity of apportionment, and their speculative character;
 
 
 [4]
 The existence of other, more appropriate plaintiffs;
 
 
 [5]
 The nature of the plaintiff's claimed injury
 R.C. Dick Geothermal Corp. v. Thermogenics, Inc., 890 F.2d 139, 146 (9th Cir.1989) (en banc) (citing Associated General Contractors of California v. California State Council of Carpenters, 459 U.S. 519, 537-45, 103 S.Ct. 897, 908-12, 74 L.Ed.2d 723 (1983)).
 
 
 [5]
 See generally Associated General Contractors of California, 459 U.S. at 542, 103 S.Ct. at 910 ("The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party ... to perform the office of a private attorney general.")